UNION TRUST COMPANY *v.* ILLINOIS MIDLAND RAILWAY COMPANY.

BORG & Another *v.* ILLINOIS MIDLAND RAILWAY COMPANY.

WARING & Others *v.* UNION TRUST COMPANY.

FLETCHER & Others *v.* ILLINOIS MIDLAND RAILWAY COMPANY & Another.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ILLINOIS.

Submitted January 12, 1886.—Decided April 5, 1886.

Three railroad companies in Illinois, with roads, one from Peoria to Decatur, one from Paris to Decatur, and one from Paris to the Indiana line, in the direction of Terre Haute, Indiana, each, before September, 1874, issued bonds secured by a mortgage on its road. In September, 1874, each of the other two companies conveyed its road to the Peoria and Decatur Company, the latter assuming "all the bonded and floating indebtedness" of the other companies. In November, 1874, it changed its name to that of the Illinois Midland Company, and in January, 1875, issued bonds secured by a mortgage covering all its property, original and purchased, with the view of exchanging them, dollar for dollar, for the bonds of the sectional roads. In September, 1875, the owner of a majority of the stock of the companies, with judgment creditors of the Paris and Decatur Company, brought a suit in equity in a State Court in Illinois against the Illinois Midland Company, to have a receiver of all its property appointed, and an account taken of all the claims and liens of its stockholders and creditors, and of those of the sectional companies, and to have them paid and adjusted according to equity. Such a receiver was immediately appointed, with power to run the road. In December, 1876, the Union Trust Company, trustee in the mortgages on the Paris and Decatur road, the Paris and Terre Haute road, and the Illinois Midland road, filed a bill in the proper Circuit Court of the United States in Illinois to foreclose those three mortgages ; and in September, 1877, it was made a defendant in the State court suit, on its own petition, alleging a default by October 1, 1875, in the payment of interest on the bonds embraced in all three of the mortgages. In February, 1878, it filed two bills in the same Federal court, each for the foreclosure of one of the two sectional road mortgages held by it. In April, 1878, it removed into that court the State court suit.

In August, 1881, holders of Paris and Decatur bonds filed a bill in the same Federal court to foreclose the Paris and Decatur mortgage. By an order made in June, 1882, that court consolidated all the suits. Successive receivers, each displacing the prior one, were appointed by the State court in August, 1876, and by the Federal court in December, 1878, and April, 1882. In June, 1882, a special commissioner was appointed to report as to the certificates of indebtedness issued by the receivers. He made his report in April, 1883, and, on exceptions to it, an interlocutory decree was made in June, 1884, making specific adjudications as to various receiver's certificates and other receiver's debts, and directing the commissioner to report as to other matters. He did so in January, 1885, and exceptions were filed to the report. A final decree in June, 1885, disposed of the litigated questions, and provided for a sale of the mortgaged property and the distribution of the proceeds. Holders of Paris and Decatur bonds appealed because the decree gave to sixteen receiver's certificates priority over those bonds. When the first order was made under which six of the certificates were issued, neither any of the Paris and Decatur bondholders, nor their trustee, were parties to the suit, but before any other order was made under which any of the certificates were issued, the trustee was made a party, and the Paris and Decatur interest had been in default for ten months when such first order was made: *Held,*

(1.) Certificates issued for necessary repairs must be allowed priority.

(2.) It is no objection to this rule, that the suit in which the first receiver was appointed was not brought by the bondholders, or their trustee;

(3.) The bill in that suit was sufficient to enable a court of equity to administer the property and marshal the debts;

(4.) It was sufficient, if the bondholders and their trustee were, after they were made parties, heard as to the merits of such first order, and the application of the money for which the certificates were issued;

(5.) The certificates issued to pay tax liens are to have priority;

(6.) Persons having no connection with the case or the parties, who take directly from the receiver receiver's certificates issued to pay for necessary repairs, are not bound to see to the application of the proceeds;

(7.) The holders of interest-bearing receiver's certificates, taken within the limit of discount allowed by the court in the order authorizing the certificates to be issued, are entitled to the face of the certificates and the interest;

(8.) Receiver's certificates issued to replace earnings diverted from paying for operating expenses and ordinary repairs, to pay for replacing worn-out parts of the road, while large debts had been incurred for the operating expenses and ordinary repairs, are to be allowed priority;

(9.) It was not necessary to have the express consent of the bondholders, to create a lien prior to the bonds on the *corpus* of the property, on the facts of this case, and in view of the neglect of their trustee to interpose all the while the road was openly in the charge of the receiver, and being run, with the interest on the bonds in arrear;

(10.) Items for wages due employés of receiver; debts due from them to other railroad companies, and for supplies and damages; wages due employés

of the road within six months immediately preceding the appointment of the first receiver ; and debts incurred for the ordinary expenses of the receivers in operating the road may be allowed priority out of the *corpus* of the property, if there is no income fund, after scrutiny and opportunity for those opposing to be heard ;

(11.) The terms of the first order appointing the receiver did not impair or exclude the authority of the court to give priority to the claims above mentioned ;

(12.) It is proper to apportion among the three sectional roads, in proportion to their lengths, the items so allowed priority of lien, which include the terminal expenses and track rentals of the three sectional roads, although such expenses and rentals were different for each of them ;

(13.) The objection that there was no authority to buy the Paris and Decatur road cannot prevail, because the non-action of the bondholders and their trustee, in allowing the court and the receivers to go on contracting debts in respect to the line operated as a unit, under circumstances where no separation can be made as to the matters questioned, and where important rights have accrued on the faith of the unity of the interests, amounts to such acquiescence as should operate as an estoppel.

As to 994 Paris and Decatur bonds, surrendered and exchanged absolutely for Illinois-Midland bonds, and marked "cancelled," they cannot be reinstated and put on a footing with bonds not exchanged, because the contracts under which they were exchanged were complied with, and the transaction was completed, no surrender of any of the bonds having been made dependent on the surrender of any other bonds, or of the whole.

There being five several properties to be sold, it is proper to put up for sale each of the five separately, and then all five in gross, and, if the highest bid for the five in gross exceeds the aggregate of the highest separate bids, to strike off and sell the whole as an entirety to the person making the bid, and divide the proceeds into five parts, in proportion to the separate bids, and make distribution accordingly.

Certain debts due by the receivership to other railroads for rent of track, materials and stores supplied, labor performed, and traffic balances, the debts having been purchased by other parties, are to be allowed priority.

Debts for large sums of money borrowed by the receiver without previous authority from the court, are not to be allowed priority, although the moneys were applied to pay expenses of the receivership, repairs, supplies, and pay-rolls, and to replace moneys which had been so applied; because there never could be any difficulty in obtaining an order of the court, if one were proper, to borrow money to a specified total amount, for specific purposes.

Rents due for use of rolling stock, and money due for extraordinary depreciation of rolling stock, and certain other items, were not allowed priority in this case.

No priority or preference among the debts and claims, whether receiver's certificates or other debts, given precedence over the mortgage bonds, was allowed, (except as to debts for taxes, and receiver's certificates issued to

borrow money to pay taxes, or to discharge tax liens), although, in the orders under which some of the certificates so given precedence were issued, it was declared that each certificate should be a lien on the property in respect of which it should be issued, superior to all mortgage bonds and receiver's debts, except receiver's debts theretofore declared, by order of court, to be special liens on such property.

Each one of the two principal appellants having succeeded in part on his appeal, no costs were allowed in this court for or against any party, and the expense of printing the record was charged equally on such two appellants.

The case is stated in the opinion of the court.

*Mr. Edward S. Isham* and *Mr. Wheeler H. Peckham* for Union Trust Company.

*Mr. Edward S. Isham* for Borg & others.

*Mr. H. Crea* and *Mr. Charles A. Ewing* for Waring & others.

*Mr. John M. Butler*, *Mr. John T. Dye* and *Mr. W. P. Fishback* for Fletcher & another.

*Mr. H. S. Greene* for Wabash, St. Louis & Pacific Railway Company.

*Mr. John M. Palmer* and *Mr. Josiah M. Clokey* for Sylvester & others.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

The Peoria, Atlanta and Decatur Railroad Company was incorporated as an Illinois corporation, in 1869, to construct a railroad from Peoria, in Tazewell County, in a general southeasterly direction, through Atlanta, in Logan County, to Decatur, in Macon County. Such of the road as was constructed was built in 1873 and 1874, from a point five miles east of Peoria, on what is now the Wabash, St. Louis and Pacific Railroad, to a place called Maroa, on the Illinois Central Railroad, thirteen miles north of Decatur. It did not reach either Peoria or Decatur, and the company owned no station grounds or terminal facilities at either place, but used, by lease, five

miles of what is now the Wabash, St. Louis and Pacific Railroad, to reach Peoria, and thirteen miles of the Illinois Central Railroad, to reach Decatur. On the 25th of April, 1872, the company executed a mortgage to James F. Secor, as trustee. The mortgage recited that the company had commenced to construct a railroad to "extend from Cunningham's crossing, five miles from the city of Peoria, on the Toledo, Peoria and Warsaw Railway, thence southeast, to a point at or near to the city of Decatur," "a distance of about sixty-seven miles," and it covered the company's franchises, and its road and property, as constructed and to be constructed, acquired and to be acquired, "commencing at Cunningham's crossing, five miles from the city of Peoria, on the Toledo, Peoria and Warsaw Railway, to the city of Decatur," "a distance of sixty-seven miles." It was given to secure 1300 coupon bonds of the company, of $1000 each, payable to bearer, amounting to $1,300,000, carrying semi-annual interest at seven per cent. per annum, and payable May 1, 1902. The mortgage provided that on default continuing more than sixty days in the payment of any interest on any bond, the trustee, on the request of the holders of a majority of the bonds, might and should take actual possession of the mortgaged property, and operate the road, and receive its income, to pay the bonds, or, on the written request of the holders of at least one-half of the outstanding bonds, cause the mortgaged property to be sold at public auction, and convey it to the purchaser, and, "after deducting from the proceeds of said sale the costs and expenses thereof, and of managing such property," apply the proceeds to pay the principal and interest of the bonds. The mortgage also provided that the trustee should "be entitled to have proper compensation for every labor or service performed by him in the discharge of this trust, in case he shall be conpelled to take possession of said premises and manage the same." This mortgage was delivered and duly recorded.

The Paris and Decatur Railroad Company was incorporated as an Illinois corporation, in 1861, to construct a railroad from Paris, in Edgar County, westwardly to reach Decatur. This road was constructed, in 1871 and 1872, from Paris to a point

on the Illinois Central Railroad about two miles south of De-
catur, and, although it had its own station and grounds at De-
catur, it entered them by using, by lease, about two miles of
the track of the Illinois Central Railroad.   On the 1st of July,
1871, the Paris and Decatur Company executed a mortgage to
Joseph U. Orvis and William Adams, Senior, covering its fran-
chises and its line of road and property, constructed and to be
constructed, acquired and to be acquired, extending from Paris
to Decatur, " a distance of seventy-five miles," to secure 800
coupon bonds of $1000 each, and 800 coupon bonds of $500
each, in all $1,200,000.   The mortgage was delivered and re-
corded, and the bonds were put into the hands of the trustees,
and some of them were issued but afterwards retired, and all
of them were destroyed, but the mortgage remains on record,
not released.   On the 1st of July, 1872, the Paris and Deca-
tur Company executed a mortgage to the Union Trust Company,
a New York corporation, covering its franchises, and its road
and property, constructed and to be constructed, acquired and
to be acquired, extending from Paris to Decatur, " a distance of
seventy-five miles," to secure 2400 coupon bonds, of $500 each,
payable to bearer, in all $1,200,000, carrying semi-annual interest
at seven per cent. per annum, and payable July 1, 1892.   The
mortgage provided, that in case default in paying any interest
on any bond should continue for six months after demand, the
principal of all the bonds should forthwith become due, and
the lien might be at once enforced, in which case it should be
lawful for the trustee to enter on the mortgaged property, and
to use and operate it until it should be sold under the power
contained in the mortgage, or under the decree of a competent
court, " and until such time, and from time to time, to make all
needful repairs and replacements, and such useful alterations,
additions and improvements to said railroad as may be neces-
sary for the proper working of the same, and to receive the
tolls, freights, incomes, rents, issues and profits thereof, and,
after deducting the expenses of operating and managing the
said railroad and other property, and of the said repairs, re-
placements, additions and improvements, as well as just com-
pensation for its own services and for the services and disburse-

ments of such attorneys and counsel as it may employ, to apply the moneys accruing as aforesaid to the payment of said bonds *pro rata.*" The mortgage also provided, that, in case default should be made and should continue as aforesaid, the trustee might, and, upon the written request of the holders of at least one thousand of the bonds outstanding, should, foreclose the mortgage by legal proceedings, or should sell the mortgaged property at public auction at New ·York or at Paris, and convey it to the purchaser; and that, in case of such sale, the trustee should deduct from the proceeds its just allowances for the expenses thereof, including attorney's and counsel fees and disbursements, " and all expenses which may be incurred in operating, managing or maintaining the said railroad, or in managing the business thereof, as well as just compensation for the services of said trustee," and thereafter apply the proceeds to pay the principal and interest of the bonds *pro rata.* This mortgage was delivered and duly recorded.

The Paris and Terre Haute Railroad Company was organized as a corporation, under the general railroad laws of Illinois, in 1873, and the road was built in 1873 and 1874. It runs eastwardly from Paris to Farrington, in Illinois, a point on the St. Louis, Vandalia and Terre Haute Railroad, seven· miles west of Terre Haute, and the company uses, by lease, the track of the latter road to reach Terre Haute. On the 1st of April, 1874, the company executed a mortgage to the Union Trust Company, covering its franchises and its road and property, constructed and to be constructed, acquired and to be acquired, extending from Paris to the junction with the St. Louis, Vandalia and Terre Haute Railroad, a distance of about fourteen miles, to secure 280 coupon bonds, of $1000 each, payable to bearer, in all $280,000, carrying semi-annual interest at the rate of seven per cent. per annum, and payable April 1, 1894. The mortgage contained like provisions with the Paris and Décatur mortgage as to what might be done after six months' default in interest, and as to taking possession of the property, and as to the powers of the trustee, and as to foreclosure or sale and disposition of the proceeds. This mortgage was delivered and duly recorded.

On the 19th of September, 1874, the Paris and Decatur Company conveyed by deed to the Peoria, Atlanta and Decatur Company, in consideration that the latter company thereby assumed " all the bonded and floating indebtedness" of the former company, the railroad then in operation, described as extending from Paris to Decatur, " passing into and through the counties of Edgar, Coles, Douglass, Moultrie and Mason," including the franchises of the former company, and all its property acquired and to be acquired.

On the same day the Paris and Terre Haute Company conveyed by deed to the Peoria, Atlanta and Decatur Company, in consideration that the latter company thereby assumed the payment of " all the bonded and floating indebtedness" of the former company, the railroad then in operation, described as extending from Paris to the line between Indiana and Illinois, " passing into the counties of Edgar and Clark," including the franchises of the former company, and all its property acquired and to be acquired.

These purchases on these terms were authorized by the stockholders and directors of the purchasing company, and by the respective stockholders and directors of the selling companies, and the deeds were delivered and duly recorded.

On November 2, 1874, the Peoria, Atlanta and Decatur Company, under the provisions of the general law of Illinois, changed its name to that of the " Illinois Midland Railway Company." On the 1st of January, 1875, that company executed to the Union Trust Company a mortgage covering all of its property, including that so purchased, to secure 8350 coupon bonds, of $500 each, in all $4,175,000, bearing semi-annual interest at seven per cent. per annum, and payable January 1, 1905. This mortgage was delivered and recorded.

On the 11th of September, 1875, Robert G. Hervey and two other parties filed a bill in equity in the Circuit Court of Edgar County, Illinois, against the Illinois Midland Railway Company. It set forth that Hervey owned a majority of the stock of the corporations above named, and that the other plaintiffs were judgment creditors of the Paris and Decatur Company,

with executions returned unsatisfied; that there were judgments to the amount of about $200,000 against the Illinois Midland Company, on account of the construction and operation of the various corporations, and pending suits against it for about $100,000, on like account, and executions out against it for over $100,000, on debts of the various corporations, on which its property was advertised for sale; that certain creditors and stockholders of the Paris and Decatur Company, a minority in number and amount, were threatening to have the Illinois Midland Company and its property placed in the hands of a receiver; that the plaintiffs represented a majority of the stock in all of the corporations, and desired to have a receiver of the franchises, railways and rolling-stock of the corporations appointed immediately, and without further notice, or the rights of the creditors and stockholders would be irreparably prejudiced; that negotiations were pending, which the plaintiffs believed would be successful; to raise sufficient money to pay off all judgments, liens and claims against the company, if left under the present control, or under that of the holders of a majority of the stock; that, to effect such loans or advances of money, it was absolutely necessary that the respective debts of the various corporations should be ascertained, and, when their respective liabilities to each other and to their respective creditors were fixed, they could, on their joint stock and assets, raise sufficient money to relieve them from their embarrassments and pay all their creditors; that, if a receiver was appointed to take charge of them and settle their affairs, their credit would be restored as soon as their condition should be adjudged by the court; and that they had ample assets, if not sacrificed by sales on execution and construction liens, to pay all indebtedness and leave a sufficient surplus to run the road for the benefit of the stockholders. The prayer of the bill was, that a receiver be appointed of all the rights and franchises of the Illinois Midland Company, and of all the property in its control, and that an account be taken of all the claims, liens and liabilities of its stockholders and creditors, and of those of the corporations above named, and they be ordered to be paid and adjusted, as the respective rights and interests

of such stockholders and creditors should appear; and for further and other relief, according to equity.

On the same day the Illinois Midland Company appeared to the bill by attorney, and waived notice, and submitted itself to the court for such order in the premises as might in equity be right and proper, and the judge of the court, at chambers, made an order appointing as receiver George Dole, of Paris, and requiring him to give a bond for $75,000, with security, and then to "forthwith take possession of all the personal, real and mixed property of every kind belonging to or in the possession of said Illinois Midland Railway Company, including the property formerly owned and possessed by the Peoria, Atlanta and Decatur Railroad Company, the Paris and Decatur Railroad Company, and the Paris and Terre Haute Railroad Company, and, if necessary, to sue for, in the name of said receiver, and recover, all the property of said company or companies, whether real, personal or mixed, and whether in possession or in action." The order also provided as follows:

"It is further ordered, adjudged and decreed, that said receiver be, and is hereby, empowered and directed to carry on the business of said railway companies until the respective rights of the parties in interest can be fully ascertained and determined, under and subject to the revision and direction of this court, and until otherwise ordered by this court, and to use and employ the property, franchises, rights of way, roadbed, tracks, locomotives, rolling-stock, machinery, fixtures, and property of whatever kind or nature; and said receiver shall be, and hereby is, invested with all the rights and franchises vested by law in said railway company or companies, in the execution of the duties and trusts aforesaid. Said receiver shall have authority to employ all necessary and proper agents, attorneys, officers and laborers, and to fix and alter the compensation of said agents, attorneys, officers and laborers, subject to the revision of this court. Said receiver shall also have authority, subject to the revision of this court, to make such repairs and necessary additions to said railway, or railroads, and property, as may be essential to the interests and safety of the same, and proper in his judgment for carrying on said bus-

iness; also to make all contracts that may be necessary in carrying on the business of said company or companies, subject to like supervision of this court; also to collect in his own name, as receiver aforesaid, all debts, claims or demands, of whatever kind or nature, owing, or that may become due and owing, to the said company or companies, or to said receiver, from any and all sources. Said receiver is also ordered to make a full, true and correct inventory of all the property that may come into his hands as such receiver. It is further ordered, adjudged and decreed, that, out of the moneys that shall come into the hands of said receiver from the operation of said railway, he shall: *First.* Pay all current expenses incident to the creation or administration of this trust, and to the operating of said railway or railroads. *Second.* Pay all sums due or to become due connecting or intersecting lines of railroads, arising from the interchange of business, and for track service of other railroads used by said Illinois Midland Railway Company in the operation of its lines, and all amounts now legally due from said railway company or companies for taxes. *Third.* Pay all amounts due to all operatives and employés and attorneys and agents of said company or companies, for any service rendered said company or companies since the 11th day of March, A. D. 1875. *Fourth.* Pay all amounts due for supplies purchased and used in operating said railway or railroads by said company or companies, for supplies furnished to laborers and credited against their labor, since the 11th day of March, A. D. 1875. *Fifth.* And all amounts due from said railway company for or on account of the rental of rolling-stock; and the money belonging to said railway company, except as heretofore directed, shall be held by said receiver until he is authorized to disburse the same under the order or decree of this court. *Sixth.* And said receiver is further authorized, in case it is proper in his judgment, with the sanction of the court, to use any balance of funds arising from the operating of said railway or railroads, for the purpose of protecting such of the real or personal property of said corporation or corporations, under lien, sale, pledge, mortgage or contract. It is further ordered, that, upon demand, the said

company or companies, their officers or agents, shall forthwith deliver over to the receiver all the property aforesaid, and that neither said company or companies, nor any officer or agent or employé of said companies, shall interfere with or molest the possession or enjoyment of any of said property in the possession of or placed under the control of said receiver. It is further ordered, that said receiver shall retain possession and continue to discharge the duties and trusts aforesaid, until the further order of this court in the premises; and that he shall, from time to time, make report of his doings in the premises, and may, from time to time, apply to this court for such other and further order and direction in the premises as he may deem necessary and requisite to a due administration of said trust, and said receiver is hereby vested, in addition to the powers aforesaid, with all the general powers of receiver in cases of this kind, subject to the supervision of this court." The bond was given and was approved by the court, and at September Term, 1875, an order was made entering of record the order at chambers, and the receiver's bond and oath, and directing him to proceed, as before ordered.

On the 16th of October, 1875, an amended bill was filed, the plaintiffs in which were Hervey, and also William Waring, Henry Waring, and Charles Waring, partners, as Waring Brothers, and thirty-one other persons. It set forth that Hervey then owned 27,500 shares, or $1,375,000, of the 32,000 shares, at $50 each, or $1,600,000, of the capital stock of the Paris and Decatur Company; and 14,200 shares, or $1,420,000, of the 20,000 shares, at $100 each, or $2,000,000, of the capital stock of the Peoria, Atlanta and Decatur Company; and 4500 shares, at $100 each, or $450,000, being the entire capital stock of the Paris and Terre Haute Company. It also set forth that Waring Brothers then owned one-fourth, or $500,000, of the capital stock of the Illinois Midland Company; and 1543 of the bonds of that company; and 885 others of its bonds, which they had taken in exchange for 885 bonds of the Paris and Decatur Company, of like amount. The other plaintiffs were judgment and general creditors of the four corporations, whose debts were stated at $108,112.23, on account of the

construction and operation of the various companies. The amended bill averred that, in consequence of the facts set forth in the original bill, and which were repeated, the Illinois Midland Company was unable to transact its necessary business; that the executions and levies referred to had removed from its use a large portion of its rolling-stock; that the suits and judgments had seriously impaired its credit, and it was unable to procure the necessary supplies, materials and labor to successfully operate the road; and that some of the hands employed in maintaining its track had declined to labor further, whereby its track had become unsafe. The prayer of the amended bill was the same as that of the original bill.

The further action of the court in regard to the receiver and his successors, and their proceedings, will be referred to hereafter, as questions in regard to those proceedings shall be considered.

On the 15th of February, 1876, Albert Grant and Maurice Grant, partners, as Grant Brothers & Co., of London, and also James F. Secor, petitioned and were admitted to be defendants, and on the same day they filed their respective answers to the amended bill. Grant Brothers & Co. claimed to own 1200, or one-half of the Paris and Decatur bonds, 1200 of the 1300 Peoria, Atlanta and Decatur bonds, and all (280) of the Paris and Terre Haute bonds; and that the lien of their bonds was superior to the claims of any of the plaintiffs.

The answer of Secor set up his mortgage, and alleged that none of the interest due May 1, 1875, on the bonds of the Peoria, Atlanta and Decatur Company, had been paid, and he had been requested by the holders of a majority of those bonds to take steps to protect their interests; and that by the terms of the mortgage he was entitled to take possession of the road for the benefit of the bondholders. He asked that the court would order the receiver to turn over to him the property covered by the mortgage of the Peoria, Atlanta and Decatur Company.

On the 4th of October, 1876, the Paris and Decatur Company and the Paris and Terre Haute Company were made defendants to the bill, and they severally appeared on October 10, 1876, and at the March Term, 1877, put in answers.

On the 5th of December, 1876, the Union Trust Company filed a bill in the Circuit Court of the United States for the Southern District of Illinois, against the four corporations and Hervey and Secor, to foreclose the three mortgages made to the Union Trust Company. But this suit does not appear to have been further prosecuted, except that by the interlocutory decree of June 11, 1884, hereafter mentioned, it was consolidated with the other causes.

At September Term, 1877, the Union Trust Company was, by order, made a party defendant in the Hervey suit, " with all the rights and privileges as though it had been an original defendant," on its petition setting forth a default. July 1, 1875, in the payment of interest on the Paris and Decatur bonds, and that it had demanded and been refused payment of such interest, and that the principal and interest of the bonds had become due, and that a majority of the holders of the bonds had required it to proceed to foreclose the mortgage; and that the same was true as to a default October 1, 1875, in the payment of the interest on the Paris and Terre Haute bonds, and as to a default July 1, 1875, in the payment of the interest on the Illinois Midland bonds.

On the 15th of February, 1878, the Union Trust Company filed a bill in the Circuit Court of the United States for the Southern District of Illinois, against the Paris and Decatur Company and the Illinois Midland Company, to foreclose the Paris and Decatur mortgage, alleging a default January 1, 1876, in the payment of interest on the Paris and Decatur bonds; that the Illinois Midland Company, in issuing its 8350 bonds, intended to exchange them, dollar for dollar, for the bonds of the other three corporations; and that more or less of the Paris and Decatur bonds were exchanged, and some were, on exchange, marked cancelled, but the persons who exchanged them claimed that the purchases by the Peoria, Atlanta and Decatur Company of the other two roads were void, and that the bonds issued by the Midland Company were void, and that the exchange and cancellation of the Paris and Decatur bonds were void, and that those bonds remained the property of their former owners.

On the same day the Union Trust Company filed a bill in the same Federal court against the Paris and Terre Haute Company and the Illinois Midland Company, to foreclose the Paris and Terre Haute mortgage, alleging a default October 1, 1875, in the payment of interest on the Paris and Terre Haute bonds, and containing, in regard to the exchange of those bonds, like allegations with those above set forth as to Paris and Decatur bonds, in the bill to foreclose the Paris and Decatur mortgage.

On the same day Secor filed a bill in the same Federal court, against the Illinois Midland Company, to foreclose the Peoria, Atlanta and Decatur mortgage, alleging a default May 1, 1875, in the payment of interest on the Peoria, Atlanta and Decatur bonds.

On the 6th of April, 1878, by an order of the State court, the Hervey suit was, on a petition filed by the Union Trust Company, removed into the Circuit Court of the United States for the Southern District of Illinois.

On the 13th of August, 1879, the last two suits brought by the Union Trust Company and the suit brought by Secor were consolidated by the Federal court.

On the 31st of August, 1881, Abe Freidenberg, on behalf of himself and other holders of Paris and Decatur bonds, filed a bill to foreclose the Paris and Decatur mortgage, in the same Federal court.

The last two suits brought by the Union Trust Company, the suit brought by Secor, the Hervey suit, the Freidenberg suit, and a suit which had been brought in the same Federal court, by the Kansas Rolling-Mill Company, in January Term, 1879, against the Illinois Midland Railway Company and others, were consolidated by an order made June 23, 1882.

Many of the contested questions in these cases arise out of the transactions of the receiver originally appointed and his successors, especially in issuing receiver's certificates; and the contest, as presented to this court, is substantially one between the Paris and Decatur bondholders on one side, and those who claim a priority of lien over the bonds on the other.

On the 31st of August, 1876, Richard J. Rees was, by an order made at chambers, by the Judge of the State court, in

the Hervey suit, appointed receiver in the place of Dole, resigned, and the order was confirmed by the court at the September Term, 1876. On the 10th of December, 1878, Louis Genis was, by an order made by the Federal court in the Hervey suit, appointed receiver in the place of Rees, resigned. On the 4th of April, 1882, by an order made in the Freidenberg suit, David H. Conklin was appointed receiver in the place of Rees, resigned, and on the 13th of April, 1882, a like order was made in the Hervey case. Genis having filed his final report, the court made an order, on May 13, 1882, appointing a special commissioner to examine and report thereon, and on the correctness of Genis' accounts. By an order made June 13, 1882, power was given to the commissioner to examine witnesses as to the contents of the report and the acts of Genis as receiver. By an order made June 22, 1882, the commissioner was directed to investigate and report in detail the number and amount of certificates of indebtedness issued by the several receivers, and for what purpose they were issued, and to whom, and the number and amount of such as were special liens on any of the property, and the character of the charge of all which were not specific liens. By an order made June 23, 1882, it was ordered that the issues in the consolidated causes be made up by a day named, and that by that day the commissioner report the amount of receiver's certificates outstanding, for what they were given, and by whom held, and the amount of the receivers' indebtedness and to whom due.

On the 18th of April, 1883, the commissioner made a report, as to the matters referred to him, to which exceptions were filed by Freidenberg, by the Union Trust Company and Secor, and by judgment creditors of the Paris and Decatur Company, and by Adams and Orvis. On the 7th of June, 1884, the commissioner filed a supplemental report. He also reported the testimony taken before him. The cases were brought to a hearing in the Circuit Court before Mr. Justice Harlan, (all orders made in them prior to that time, in the Federal court, having been made by the District Judge), and he passed on the various questions raised, in an opinion filed February 29,

1884. An interlocutory decree was entered June 11, 1884, confirming the report of the commissioner in all things, and making specific adjudications as to the validity and status of eighteen different series of receiver's certificates, and of other debts incurred by the receiver, and referring it to the same commissioner to take certain accounts, and to report the amounts due on the various outstanding bonds, and the numbers and amounts of the bonds of the sectional mortgages which had been surrendered and exchanged for Illinois Midland bonds, and what Paris and Decatur bonds remained outstanding, which had not been exchanged for Illinois Midland bonds, and the amount due from one to the other of the three sectional roads, making proper allowance for the use by them respectively of rolling-stock or terminal facilities belonging to the others, and for moneys paid by one for expenses or debts properly payable by another; and to report a proper distribution of the liens or obligations on or of the different roads, to pay any of the receiver's certificates or indebtedness; and as to which road should pay for terminal facilities, and what indebtedness the receivers had incurred therefor, and for rent of rolling-stock, motive power, and other matters; and to take and report all other testimony offered by any party, pertinent to the issues. The commissioner was also directed to take an account of all the indebtedness of the receivership, and of all claims of employés which accrued within six months before the first appointment of a receiver, and of all claims for rights of way or lands used for railroad purposes, not paid for, and of all bonded indebtedness of the four corporations, properly classified; and to report as to all contested claims, with the testimony thereon.

The commissioner made his report on the 15th of January, 1885, accompanied by the additional testimony he had taken. Freidenberg and other holders of Paris and Decatur bonds filed exceptions to it, as did Waring Brothers and certain judgment creditors of the Paris and Decatur Company and of the Illinois Midland Company.

The case was heard in the Circuit Court by Mr. Justice Harlan, and on the 3d of June, 1885, a final decree was en-

tered disposing of the questions litigated, and providing for a sale of the mortgaged property and the distribution of the proceeds. Freidenberg appealed to this court from specified parts of the decree of June 11, 1884, and from specified parts of the decree of June 3, 1885, as representing holders of Paris and Decatur bonds, but this appeal was not perfected, and in place of it, Simon Borg, Leo Speyer, and Samuel Lichtenstadter were admitted as parties to the consolidated causes, as holders of Paris and Decatur bonds, and by leave took and perfected an appeal from specified parts of both decrees. Waring Brothers and the Union Trust Company have taken separate appeals from the last decree; and Stoughton J. Fletcher and Francis M. Churchman, partners as S. A. Fletcher and Company, have appealed, as holders of receiver's certificates, from that decree.

It will be proper to first consider the question of the receiver's certificates.

The final decree declares that the lien of the Paris and Decatur bonds is subject to certain receiver's certificates of the 8th, 12th, 14th, 16th, 17th and 18th series, which are to have priority in payment to the Paris and Decatur bonds, out of the proceeds of sale of the Paris and Decatur road, and which amount, with interest to January 15, 1885, to $200,408.87.

There are six certificates of $5000 each, of the 8th series, bearing ten per cent. interest. They were issued under an order made October 9, 1876, which states that the court finds that the entire line from Peoria to Terre Haute is in great need of immediate repair, and in an unsafe condition to be operated, and that the line between Paris and Decatur is in a worse condition than any of said line, and requires an immediate outlay, for iron, ties, and other materials, ballasting and labor, to put it in a safe condition, of $34,076, and authorizes the receiver to borrow $34,360, to be expended in repairing the Paris and Decatur road, and to issue receiver's certificates therefor in sums of $5000 each, bearing ten per cent. interest, and declares that the certificates "shall be a first lien on the right of way, iron, ties, bridges and entire railway property on said portion of the line between Paris and Decatur." The

commissioner finds that the moneys were expended in accordance with the order.

There is one certificate of the 12th series, for $32,475.20, with ten per cent. interest, issued under two orders, to borrow money to pay off tax liens, the orders declaring that it should be a lien on the Paris and Decatur line superior to the mortgage and to all prior certificates. It was taken at par. When it was issued the legal rate of interest was eight per cent., ten per cent. having been the legal rate at the time of the first order, and having been the rate specified in that order, and the authority conferred by the first order being made part of the second. The commissioner states that the only dispute was as to the rate of interest; that the money was advanced under the first order, made July 26, 1878, before the issue of the cirtificate, and at a time when the legal rate of interest was ten per cent.; that that order authorized the sale of the certificate at ninety cents on the dollar; that the mortgagees and bondholders waive any plea of usury, and the corporation itself could not plead usury; and that that defence was made only by the trustee for the holders of surrendered bonds and by judgment creditors. The commissioner reported it as his opinion that the certificate should have effect, as to its amount and lien and rate of interest, as authorized, and according to its purport. The Circuit Court confirmed this view.

There is one certificate of the 14th series, for $4376 and eight per cent. interest, issued under the before-named order of October 9, 1876, and a subsequent order made January 29, 1881, for money to repair the Paris and Decatur road, being for the balance of money authorized by the first order, the second order declaring the like lien as the first order.

There is one certificate of the 16th series, for $9505 and eight per cent. interest, and three certificates of the 17th series, two of them for $10,000 each, and one for $5495, all with eight per cent. interest, issued under an order made June 29, 1881, which set forth that it was necessary to the protection of the railroad property that an outlay should be made forthwith for betterments; and authorized the receiver to expend in betterments on the line between Paris and Decatur, $35,000, and to

issue certificates to procure money for that purpose, and sell them at not less than ninety cents on the dollar, the same to be a special charge on the line and railroad property between Paris and Decatur, superior to all liens and debts, except receiver's debts before declared by order of court to be special charges or liens on that portion of the railroad. The commissioner states that these certificates were sold, some at four and some at six per cent. discount; and that the holders of the certificates, when they bought them, had no connection with the case or with the parties.

There are four certificates of the 18th series, three of them for $10,000 each, and one for $8,288.98, all at eight per cent interest, issued under another order made June 29, 1881, which set forth that the receiver had expended on the Illinois Midland road, for side tracks and other betterments, $80,037.98, of which $42,664.98 had been expended on the line between Paris and Decatur; that of the $80,037.98, $63,037.98 had been paid out of the earnings of the line, of which $38,288.98 was expended on the line between Paris and Decatur; that the earnings of the whole line had not been sufficient to meet the usual expenses of operation and the ordinary repairs of the permanent way; and that the receiver had incurred unpaid debts to a larger amount than $63,037.98, in the usual operation of the line and in ordinary repairs of the permanent way. The order approved and confirmed the appropriation of the $63,037.98 out of the earnings in payment for betterments; declared that that sum was a special charge and lien on the several portions of the line in proportion to the amounts expended on the respective portions; and authorized the receiver to issue certificates to the amount of $38,288.98, at eight per cent. interest, as representing so much of the $63,037.98 as was expended for betterments on the line between Paris and Decatur, the same to be a special charge and lien on the line and railroad property between Paris and Decatur, superior to all liens and debts except receiver's debts before declared by order of court to be special charges and liens on that portion of the railway; and the certificates to be sold at not less than ninety cents on the dollar. The certificates were sold at a discount within that permitted.

Simon Borg and others appeal because of the priority awarded to the above-named sixteen receiver's certificates.

When the order of October 9, 1876, was made, under which the six certificates of the 8th series were issued, neither the trustee nor any of the bondholders of the Paris and Decatur Company were parties to the suit. But before any other order was made under which any of the sixteen certificates referred to were issued, the Union Trust Company had become a party to the Hervey suit as trustee in the Paris and Decatur mortgage, and the default in the payment of the interest on the Paris and Decatur bonds had occurred by January 1, 1876.

The certificates of the 8th and 14th series were issued 'for necessary repairs; that of the 12th to pay tax liens; those of the 16th and 17th for betterments; and those of the 18th to replace earnings diverted from paying for operating expenses and ordinary repairs, to pay for betterments, while debts to a larger amount had been incurred for the operating expenses and ordinary repairs.

In regard to the certificates issued for necessary repairs there can be no doubt, either on authority or on principle. In *Wallace* v. *Loomis*, 97 U. S. 146, on the filing of a bill by the trustees of the first mortgage on a railroad, to foreclose it, the court appointed receivers, "with power to put the road and property in repair, and to complete any uncompleted portions thereof, and to procure rolling-stock, and to manage and operate the road to the best advantage, so as to prevent the property from further deteriorating and to save and preserve it for the benefit and interest of the first mortgage bondholders and all others having an interest therein;" and with power, also, for those purposes, to raise money, by loan, to an amount limited in the order, by issuing certificates "which should be a first lien on the property." The final decree declared that the moneys raised by loan, or advanced by the receivers and expended on the road pursuant to the order, were a lien paramount to the first mortgage, and should be paid out of the proceeds of sale before the first mortgage bonds were paid. A holder of second mortgage bonds objected to such priority. On that subject, this court said, by Mr. Justice Bradley: "The

power of a court of equity to appoint managing receivers of such property as a railroad, when taken under its charge as a trust fund for the payment of incumbrances, and to authorize such receivers to raise money necessary for the preservation and management of the property, and make the same chargeable as a lien thereon for its repayment, cannot, at this day, be seriously disputed. It is a part of that jurisdiction, always exercised by the court, by which it is its duty to protect and preserve the trust funds in its hands. It is, undoubtedly, a power to be exercised with great caution, and, if possible, with the consent or acquiescence of the parties interested in the fund." It is true that the second mortgage trustees in that case were parties to the suit when the order was made, and had due notice of the application, and made no objection. As to that the court said, that the bondholders were represented by their trustees and must be regarded as bound by their acts, at least so far as concerned " the power of the court to act, in making the order, and so far as the interest of third persons acting upon the faith of it might be affected." pp. 162-3. It also said that, when the appellant became a party, he suggested no objection to the terms of the order appointing the receivers, and that there was no just exception to the order or the decree.

Property subject to liens and claims and debts, of various characters and ranks, which is brought within the cognizance of a court of equity for administration, and conversion into money, and distribution, is a trust fund. It is to be preserved for those entitled to it. This must be done by the hands of the court, through officers. The character of the property gives character to the particular species of preservation which it requires. Unimproved land may lie idle, with only payment of taxes. Improved property should be rented. Movable property that is not perishable may be locked up and kept; but if perishable, it must be sold, by way of preservation. A railroad, and its appurtenances, is a peculiar species of property. Not only will its structures deteriorate and decay and perish if not cared for and kept up, but its business and good will will pass away if it is not run and kept in good order. Moreover, a railroad is a matter of public concern. The franchises and rights of the

corporation which constructed it were given not merely for
private gain to the corporators, but to furnish a public high-
way; and all persons who deal with the corporation as credit-
ors or holders of its obligations, must necessarily be held to do
so in the view, that, if it falls into insolvency and its affairs
come into a court of equity for adjustment, involving the trans-
fer of its franchises and property, by a sale, into other hands,
to have the purposes of its creation still carried out, the court,
while in charge of the property, has the power, and, under some
circumstances, it may be its duty, to make such repairs as are
necessary to keep the road and its structures in a safe and
proper condition to serve the public. Its power to do this does
not depend on consent, nor on prior notice. Consent is de-
sirable, but is seldom practicable, where the debts exceed the
value of the property. Though prior notice to persons inter-
ested, by notifying them as parties, first requiring them to be
made parties if they are not, is generally the better way, yet
many circumstances may be judicially equivalent to prior
notice. A full opportunity, as in this case, to be heard, on
evidence, as to the propriety of the expenditures and of making
them a first lien, is judicially equivalent. The receiver, and
those lending money to him on certificates issued on orders
made without prior notice to parties interested, take the risk of
the final action of the court, in regard to the loans. The court
always retains control of the matter, its records are accessible
to lenders and subsequent holders, and the certificates are not
negotiable instruments.

The principle laid down in *Wallace* v. *Loomis*, was applied in
*Miltenberger* v. *Logansport Railway Co.*, 106 U. S. 286, 311, 312.
In that case a bill was filed by a second mortgagee against the
mortgagor, and a first mortgagee, and judgment creditors of
the mortgagor, to foreclose a mortgage on a railroad. On
the day the bill was filed, and without notice to the first mort-
gagee, a receiver was appointed, and power given him to oper-
ate and manage the road, " receive its revenues, pay its oper-
ating expenses, make repairs, and manage its entire business,
and to pay the arrears due for operating expenses for a period
in the past not exceeding ninety days, and to pay into the court

all revenue over operating expenses." After that, and without notice to the first mortgagee, who had not appeared, though notified of the order appointing the receiver, and of the pendency of the suit, the court authorized the receiver to purchase engines and cars, and to adjust liens on cars, owned by the mortgagor, and to pay indebtedness not exceeding $10,000, to other connecting lines of road, in settlement of ticket and freight accounts and balances, and for materials and repairs, which had accrued in part more than ninety days before the order appointing the receiver was made, and to construct five miles of new road, and a bridge. The petition for the order stated the necessity for the rolling-stock and for the adjustment of the liens; that the payment of the connecting lines was indispensable to the business of the road, and it would suffer great detriment unless that was provided for; and that the new road and the bridge would come under the mortgages, and their construction would be to the advantage of the bondholders. After the first mortgagee had appeared and answered, an order was made, but not on prior notice to it, authorizing the receiver to issue certificates to pay for rolling-stock he had bought under orders of the court, and to pay debts incurred for building the five miles of road and the bridge, under those orders, and to pay debts incurred for taxes, and rights of way, and back pay and supplies in operating the road, the certificates to be payable out of income, and, if not so paid, to be provided for by the court in its final order. Claims thus arising were afterwards allowed, to be paid out of the proceeds of sale, before the mortgage bonds. This court upheld such priority, as to the debts for the purchase of rolling-stock, and for the adjustment of liens, and for the construction of the five miles of road and the bridge, and for the amount due connecting lines, some of which was incurred more than ninety days before the receiver was appointed. On the latter branch of the subject it said: "It cannot be affirmed that no items which accrued before the appointment of a receiver can be allowed in any case. Many circumstances may exist which may make it necessary and indispensable to the business of the road and the preservation of the property, for the receiver to pay pre-existing debts of cer-

tain classes, out of the earnings of the receivership, or even the *corpus* of the property, under the order of the court, with a priority of lien. Yet the discretion to do so should be exercised with very great care. The payment of such debts stands, *prima facie*, on a different basis from the payment of claims arising under the receivership, while it may be brought within the principle of the latter by special circumstances. It is easy to see that the payment of unpaid debts for operating expenses, accrued within ninety days, due by a railroad company suddenly deprived of the control of its property, due to operatives in its employ, whose cessation from work simultaneously is to be deprecated, in the interests both of the property and of the public, and the payment of limited amounts due to other and connecting lines of road for materials and repairs, and for unpaid ticket and freight balances, the outcome of indispensable business relations, where a stoppage of the continuance of such business relations would be a probable result, in case of nonpayment, the general consequence involving largely, also, the interests and accommodation of travel and traffic, may well place such payments in the category of payments to preserve the mortgaged property in a large sense, by maintaining the good will and integrity of the enterprise, and entitle them to be made a first lien. This view of the public interest in such a highway for public use as a railroad is, as bearing on the maintenance and use of its franchises and property in the hands of a receiver, with a view to public convenience, was the subject of approval by this court, speaking by Mr. Justice Woods, in *Barton* v. *Barbour*, 104 U. S. 126."

In allowing the certificates of the 8th and 14th series, for necessary repairs, with priority, the master acted, and we think properly, on the authority of the cases of *Wallace* v. *Loomis* and *Miltenberger* v. *Logansport Railway Co.*

In this connection it is objected that in those cases the suits were foreclosure suits brought by trustees under mortgages, and that a different rule should obtain in a case where the trustees or the bondholders do not come into court initially, asking the aid of equity in the appointment of a receiver. It is said that the Hervey suit was not such a suit. But the co-

plaintiffs with Hervey were judgment creditors of the Paris and Decatur Company, with executions returned unsatisfied. The bill set out the precarious condition of all the property held and used by the Illinois Midland Company, and the necessity for a receiver in the interest of all the creditors of all four of the corporations, to prevent the levy of executions on such property; and it prayed for a judicial ascertainment and marshalling of all the debts of all the corporations, and their payment and adjustment as the respective rights and interests of the creditors might appear, and for general relief. The plaintiffs set forth that they represented a majority of the stock in all the corporations. This bill was quite sufficient to enable a court of equity to administer the property and marshal the debts, including those due the mortgage bondholders, making proper parties before adjudging the merits.

In regard to the fact that neither the Paris and Decatur bondholders nor their trustee were parties to the suit when the order of October 9, 1876, was made, the commissioner took the view, which the Circuit Court confirmed, that while they ought to be heard before the order was made conclusive against them, yet, as the objections to the merits of the order would not have been availing if made before it was entered, and the money had been actually and faithfully applied, under the order of the court, to the improvement of the mortgaged property, no equitable reason appeared why the bondholders should keep the benefits and escape the burden.

The certificate of the 14th series was issued not only under the order of October 9, 1876, but under that of January 29, 1881. The Union Trust Company was admitted, on its own petition, to be a party defendant in the Hervey suit in September, 1877. That petition stated that the interest on the Paris and Decatur bonds had been in default since July 1, 1875. The order of January 29, 1881, was made by the Federal court. The Union Trust Company had removed the Hervey suit into the Federal court in April, 1878, and had filed in that court a foreclosure bill on the Paris and Decatur mortgage as early as December, 1876, and another such bill in February, 1878. The interest on the Paris and Decatur bonds had been in default,

as the latter bill alleged, since January 1, 1876, and the receiver was in open possession of the entire line of road, and running it, and exercising the powers which the orders of the courts had conferred upon him.    Under these circumstances, the Paris and Decatur trustee and its bondholders in court, through it, can be heard to make no other objections to the orders except such as arise as to the merits of the expenditures made under them.    The view of the commissioner and the Circuit Court was, that the bondholders should have such rights and equities as they could have properly claimed as parties *ab initio*, and that this view should apply against them as well as for them. In this we concur.

The principles properly applicable to this branch of the case were well expressed by Mr. Justice Harlan in his opinion of February 29, 1884, as follows: "Those who take receiver's certificates must be deemed to have taken them subject to the rights of parties who have prior liens upon the property, and who have not, but should have been, brought before the court. While the court, under some circumstances, and for some purposes, and in advance of the prior lien-holders being made parties, may have jurisdiction to charge the property with the amount of receiver's certificates issued by its authority, it cannot, without giving such parties their day in court, deprive them of their priority of lien.    When such prior lien-holders are brought before the court, they become entitled, upon the plainest principles of justice and equity, to contest the necessity, validity, effect, and amount of all such certificates, as fully as if such questions were then, for the first time, presented for determination.    If it appears that they ought not to have been made a charge upon the property, superior to the lien created by the mortgages, then the contract rights of the prior lienholders must be protected.    On the other hand, if it appears that the court did what ought to have been done, even had the trustee and the bondholders been before it when the certificates were authorized to be issued, the property should not be relieved from the charge made upon it, in good faith, for its protection and preservation.    Of these rules or principles the parties who inaugurated this litigation cannot justly complain.

They were not ignorant of the fact that there were existing mortgages upon this property, and that fact should have been brought to the attention of the court at the very outset. Nor have the bondholders any ground of complaint if the court charges upon the property such expenditures as now appear to have been rightfully made in the interest of all concerned in its management, while in the hands of a receiver. As to receiver's certificates issued, with the sanction of the court, after the trustees became parties, the purchasers and holders should be accorded such rights as, by the settled principles of equity, are accorded to those who deal with judicial tribunals having jurisdiction in the premises."

The propriety of the allowance of the certificate of the 12th series for tax liens needs no argument, and we think the interest, as allowed, was proper.

As to the $35,000 of certificates of the 16th and 17th series, issued to pay for betterments, the present holders, who bought them directly from the receiver, had no connection with the case or with the parties. A question was made before the commissioner that the receiver did not faithfully apply the money as directed by the court. He held, and the Circuit Court sustained him, that these purchasers were not bound to see to the application of the proceeds, citing the decision to that effect by Mr. Justice Woods, in *Stanton* v. *Alabama & Chattanooga Railroad Co.*, 2 Woods, 506. In this view we concur.

It was also contended before the commissioner, that all that the holders of these certificates were equitably entitled to was the money they paid, and without interest, and not the face of the certificates and interest. The view taken by the commissioner and confirmed by the Circuit Court, was that, as the certificates were issued for debts contracted by the court, when it had jurisdiction of the parties and of the subject matter, to persons who in good faith invested their money for the benefit of the property in the possession of the court, the certificates should be paid according to their tenor, as authorized. We concur in these views. It may be added that, as the order of June 29, 1881, authorized the certificates to be sold at not

more than ten per cent. discount, it must be presumed that the parties taking the certificates relied on the promise to pay their face, and would not otherwise have trusted the receiver or the fund. The court which made that order thought the limit of discount a reasonable one, and the certificates were sold within that limit.

In regard to what the order calls "betterments," it appears from the petition of the receiver, on which the order was made, that the $35,000 were to be expended for ties, rails, new turntable and foundations, bridges and fences, on the existing line of road, and not for any new extent of road. An affidavit annexed to the petition, made by the roadmaster of the Illinois Midland Company, states that, in order to place the railway in a suitable condition for the safe transportation of business, the expenditure contemplated was absolutely necessary. The commissioner finds that the money was expended in substantial compliance with the order of the court, and that the improvements made by the receiver no more than made up for the deterioration of the road, especially in view of its imperfect construction and inferior material from the beginning. This finding was approved by the Circuit Court.

As to the certificates of the 18th series issued to replace earnings diverted from paying for operating expenses and ordinary repairs, to pay for betterments, while debts to a large amount had been incurred for the operating expenses and ordinary repairs, it appears by the petition of the receiver and the affidavit of the roadmaster annexed to it, on which the order of June 29, 1881, under which the certificates were issued, was made, that the expenditures for new side tracks and betterments so paid for out of earnings consisted principally of expenditures for road-bed, bridges, iron and ties, which were in a worn out and insufficient condition.

The commissioner and the Circuit Court rested the allowance of these certificates on what was said by this court in the case of *Fosdick* v. *Schall*, 99 U. S. 235, 253, 254, which views were applied in *Burnham* v. *Bowen*, 111 U. S. 776, to the effect that, when the current income of a railroad in the hands of a receiver is diverted to the improvement of the property by the

receiver, and debts for operating expenses are not paid, provision should be made, in foreclosing a mortgage on the road, to pay such debts out of the proceeds of the sale of the property. See, also, *Union Trust Co.* v. *Souther*, 107 U. S. 591.

The general principles hereinbefore stated, on which the receiver's certificates referred to are allowed, are those sanctioned in *Meyer* v. *Johnston*, 53 Ala. 237, and *Hoover* v. *Montclair & Greenwood Lake Railway Co.*, 2 Stewart (29 N. J. Eq.), 4.

The strenuous contention on the part of the Paris and Decatur bondholders is, that a court of chancery had no power, by a receiver, and, without their consent, to create, on the *corpus* of the property, any lien taking priority over the mortgage lien. But these bondholders were represented by their trustee, the Union Trust Company. It filed a bill in the Federal court as early as December, 1876, to foreclose the Paris and Decatur mortgage, and it was made a party, on its own petition, to the suit in the State court, in September, 1877. The Paris and Decatur mortgage provided, that, in case of default for six months in paying interest on the bonds, (and such default occurred at latest on January 1, 1876, and the six months expired July 1, 1876, more than three months before any order was made on which any of the certificates were issued), all the bonds should become due and the lien might be enforced, and the trustee might enter on the property, and operate it till sold, and make all needful repairs and replacements, and such useful alterations, additions, and improvements to the road as might be necessary for its proper working, and pay for them out of the income; and, also, that, in case of a default so continuing, the trustee might foreclose the mortgage by legal proceedings or sell the property by public auction, and should, in case of such sale, deduct from the proceeds all expenses incurred in operating, managing, or maintaining the road, or in managing its business, and thereafter apply the proceeds to pay the bonds. In the face of these provisions of the mortgage under which the bonds are held, and of the facts before recited as to the negligence of the trustee all the while the property was in the hands of the court, it does not at all comport with the principles of equity for the bondholders now to insist that the want of

affirmative consent by them or their trustee could paralyze the arm of the court in the discharge of its duty. The want of that aid which it was the duty of the trustee and the bondholders to give to the court in discharging its responsible functions, with the road openly in charge of the receiver and being run by him, and his acts plain to view, and the interest on the bonds in arrear, cannot be urged to a court of equity as a ground for denying its power to do what was thought by it best for the interests of all concerned, including even those who thus wilfully stood aloof.

The appellants Borg and others also complain of provisions in the final decree, giving priority over the Paris and Decátur bonds to just and equitable proportions of the following items: (1) amount of wages due employés of receivers Dole, Rees and Genis, as shown by schedules J and K of the report of the commissioner, the total amount being $76,820.90; (2) the indebtedness due from the receivership to railroad companies, as shown by schedule L of the report, amounting to $84,615.21; (3) the general indebtedness of the receivership, as shown by schedule M of the report, under the head of supplies, amounting to $67,-787.76, and under the head of "damages," amounting to $5871.-04, and forty-four items under the head of "miscellaneous," amounting to $32,937.49; (4) seven claims theretofore allowed and ordered to be paid by the court, amounting to $1493.18; (5) four claims on intervening petitions, allowed at $11,642.29; (6) amount of wages due employés of the Illinois Midland Company within six months immediately preceding the appointment of the first receiver, as shown by schedule H of the report; such equitable proportions of the receiver's indebtedness and of the six months' labor claims to be ascertained in the manner provided by the decree.

As to items (1) (2) (3) (4) and (5), while it is admitted that these debts were incurred for the ordinary expenses of the receivers in operating the road, it is contended that they are entitled to priority only out of the income of the road, and not out of the proceeds of the property itself. Of course, such items are payable out of income, if any, before the *corpus* is resorted to, but that may be resorted to when the items are proper ones to be

allowed for operating expenses, after scrutiny and opportunity for those opposing to be heard. This view is in accordance with the principles above laid down and the authorities above cited.

It is contended, however, that, in the order of September 11, 1875, appointing Dole receiver, while authority was given to him to carry on the business of the road, and to make repairs and additions essential to its interests and safety, it was provided, that, out of the moneys he should receive from its operation, he should pay for the expenses of operation ; that he was not authorized by that order to contract any debt which the receipts of the road would not pay ; that the terms of the order were such as to exclude the payment of any of the expenses embraced in the six items above named out of any fund other than the receipts from the operation of the road ; and that the orders appointing Rees and Genis were equally limited. But we think this view is not correct. The terms of these orders do not impair or exclude the ample authority which the court would otherwise have, and otherwise has, to order the claims in question to be paid out of the property itself, with priority.

The claims embraced in the six items have been carefully scrutinized and reported on favorably by the commissioner, and allowed by the Circuit Court, within and in accordance with the principles above laid down, and we think that all of them, including the " six months' labor claims " were properly allowed.

The appellants Borg and others also complain that the final decree declares that the just and equitable proportion of the floating indebtedness of the receivership, and of the six months' labor claims, so made liens prior to the bonds, shall be borne by and imposed upon the three several railroad properties, on the basis of the relative lengths of the roads, being for the Paris and Decatur 67 miles, the Peoria, Atlanta and Decatur 60½, and the Paris and Terre Haute 13½. It is urged that, in the total amount of debt to be thus apportioned among the several roads, there are included debts which, as against the Paris and Decatur bondholders, belong distinctively to the

other two roads, and should be charged exclusively on them. This view is based on these allegations: that the Peoria, Atlanta and Decatur road was never finished at either end, and always paid rent for access to Peoria at one end and to Decatur at the other; that the Paris and Terre Haute road uses the track of another road to reach Terre Haute and its terminal facilities there, and does not own one-half in value of the track between Paris and Terre Haute; and that the Paris and Decatur road uses only two miles of another road at Decatur, and has good eastern connections at Paris. In this view, it is insisted that each road should pay its own terminal charges, and the cost of reaching its own charter points. The terminal expenses and track rentals of the two roads, other than the Paris and Decatur, were always charged by the receivers against the combined Illinois Midland road. The view taken by the commissioner and the Circuit Court was, that the receiver took the roads as he found them, each incomplete, and no one reaching any important point, and was obliged to continue the leasing arrangements of the Illinois Midland Company, so as to have a continuous line from Peoria to Terre Haute, which he operated as an entirety. The commissioner stated his conclusions thus: "In the operation of the road, no separate accounts of receipts or disbursements for each section, nor of the amount of business contributed by each section, nor of the extent of the use of each road, in the transaction of the various items of business taken at the several stations, were kept; nor indeed has it been possible to keep such accounts. The Paris and Decatur road received its share of the benefits accruing from the use of the leased lines; the exact relative proportion of benefits to each sectional road it is impossible to ascertain. The operating expenses have been incurred in the management of a single undertaking for the common benefit of all parties in interest. The use of the several leased tracks was necessary for that common undertaking. Without the use of the leased tracks the road could not have entered either of its terminal points, nor the city of Decatur, which was equally essential. Neither of the sectional roads enters any one of the three main points on the line. Indeed, without the leased lines

the operation of the road, or either of the sections, would have been impracticable. And it seems to me that the rentals for the use of the leased lines were incurred as much for the common benefit as were the expenses for employés and supplies along the line. If the management of the road had been so profitable as to have left a net income to apply on the mortgage debt, the Paris and Decatur bondholders would have been entitled to their proportionate share of the income derived from the use of the leased lines; they could scarcely have expected that without contributing to the payment for the use of those lines." These views apply equally to the terminal facilities furnished by the leasing roads.

In opposition to these considerations it is urged that, while they may properly apply among the companies which were parties to the sales and purchases, they do not apply to the holders of unsurrendered and unexchanged Paris and Decatur bonds, on the ground that they had nothing to do with the conduct of a joint enterprise, and could derive no benefit therefrom; and that they denied, in the pleadings of their trustee, and now deny, the validity of the sales, and did not acquiesce in any act of union of the roads.

An argument is made that there was no affirmative legislative authority for the purchase and sale of the Paris and Decatur road. This question was considered by the Circuit Court in its opinion, and it said that, while the question was by no means free from difficulty, it was inclined to think that the warrant for the purchase was found in the charter of the purchasing company; and that, as the effect of the arrangement was to establish a continuous line from Peoria *viá* Decatur to Terre Haute, to be operated under a common management, and as there was nothing in the charters of the selling companies expressly forbidding the arrangements they made with the purchasing company, and as what was done was fully executed, and its validity had never been questioned in a direct proceeding by the State or by those interested in the selling companies, it was not disposed to make the rights of the parties in this litigation depend upon the inquiry whether the contracts were technically valid or not. Its conclusion was

stated thus: "In *Thomas* v. *Railroad Co.*, 101 U. S. 71, the court said that 'there can be no question that, in many instances, where an invalid contract, which the party to it might have avoided or refused to perform, has been fully performed on both sides, whereby money has been paid or property changed hands, the courts have refused to sustain an action for the recovery of the property or the money so transferred;' further, 'that the executed dealings of corporations must be allowed to stand for and against both parties when the plainest rules of good faith require it;' still further, 'that contracts which, though invalid for want of corporate power, have been fully executed, shall remain as the foundation of rights acquired by the transaction.' I am the more readily inclined to act upon the view indicated, because, as said by Judge Drummond, in *Dimpfel* v. *Ohio & Mississippi Railway Co.*, 9 Bissell, 129, 'both by the legislation of the State and by the construction of the same by its highest court, great encouragement has been given to the union of lines of railroad for the purpose of having them operated under some general management; the result of which has been the consolidation of many lines of road which were originally separate and distinct, but which are now operated under a uniform system.' Those who were parties to the arrangement in question, those who acquiesced in it, and those who failed in due time, by some proper proceeding, to question its validity, should be held to be estopped to raise any such question in these causes. The litigation must, therefore, be conducted to a conclusion upon the basis that the sale and transfer by the Paris and Decatur Railroad Company and the Paris and Terre Haute Railroad Company to the Peoria, Atlanta and Decatur Railroad Company is not to be here questioned." Independently of this, it is entirely sufficient to rest our conclusion on the principle that nonaction on the part of the Paris and Decatur bondholders and their trustee, which allowed the court and the receivers to go on during the entire litigation, contracting debts in respect to the whole line operated as a unit, and administering the property as one, under circumstances where, as shown, it was and is impossible to separate the interests as to

expenditures and benefits, in respect to the matters now questioned, and where important rights have accrued on the faith of the unity of the interests, amounts to such acquiescence as should operate as an estoppel. The interlocutory decree contains a clause in accordance with the foregoing conclusion, and, for the reasons above stated, we think it is right.

It is further contended, on behalf of Borg and others, that all of the receiver's debt should be borne primarily by the Peoria, Atlanta and Decatur Company, in exoneration of the Paris and Decatur mortgage, on the ground that, by the terms of the conveyance from the Paris and Decatur Company to the purchasing company, the latter assumed " all the bonded and floating indebtedness " of the selling company. It is contended that, both from the contract and by general principles, the purchasing company is bound to bear alone all expenses that will impair the security of the Paris and Decatur mortgage, and especially the expenses of running the road as a public servitude; and that the court and the receivers are bound by the same limitation. The idea underlying this view is, that the receiver appointed by the court is merely the agent of the purchasing company, and his management of the purchased road is merely a continuation of the management of the purchasing company. The view taken by the commissioner, and confirmed by the Circuit Court, was, that the receiver, as an executive officer of the court, was entrusted with all the properties committed to his charge, to use and preserve them, under the direction of the court, for the benefit of all parties in interest; that the receiver sustained the same relation to the bondholders of each of the constituent companies; that, as the property of each of them has been used and preserved for the benefit of its bondholders, it is equitable that each property should contribute its just proportion towards defraying the necessary expenses; that, as the Peoria, Atlanta and Decatur mortgage was executed more than two years before the purchase of the Paris and Decatur road, and as the obligation of operating the latter road, assumed by the purchasing company, was an ordinary liability and an unsecured obligation, the equities of the Peoria, Atlanta and Decatur

bondholders require that the expenses of operating the purchased road, whether before or after the appointment of a receiver, should not take precedence, out of the *corpus* of the property of the purchasing company, over its bonds, issued and negotiated before the transfer, to the exoneration of the bonds of the purchased road; and that it is more equitable that the expenses of the receivership, incurred under the direction of the court for the benefit of one road as well as the other, should be borne by each proportionally. We think these views are correct, and that it is right to measure the proportions according to the lengths of the roads.

Borg and others complain of the following part of the final decree: "That Waring Brothers hold nine hundred and ninety-four (994) bonds of the Paris and Decatur Railroad Company, from which the first five coupons have been detached, the numbers of which bonds are given in 'Schedule F—Exchanged Paris and Decatur bonds,' attached to said special commissioner's last mentioned report," (filed January 15, 1885); "that there is now due on said 994 bonds the principal sum of $497,000, with interest thereon as provided in said bonds and the coupons thereto attached, the principal and interest to this date amounting to the sum of $859,589.13; and that said Waring Brothers are entitled to the full benefit and advantage of said 994 bonds, the same as if said bonds had not been exchanged for those of the Illinois Midland Railway Company, and as if there had been no cancellation or attempted cancellation of the same; and it is ordered by the court, that, upon the surrender into court, for cancellation, by said Waring Brothers, of bonds of the Illinois Midland Company to an amount equal to the said 994 bonds of the Paris and Decatur Railroad Company, then the said 994 bonds of the Paris and Decatur Railroad Company shall be held, and are hereby declared to be, in full force and unsatisfied, in the hands of said Waring Brothers, the same and with like effect as the other said valid outstanding bonds of the said Paris and Decatur Railroad Company, any exchange or cancellation thereof to the contrary notwithstanding; and the special commissioner hereinafter appointed is directed to hold for cancellation such

Illinois Midland Railway bonds, when so surrendered, and to report the fact of such surrender, and holding for cancellation, to the court." The report of the commissioner shows that each of the 994 bonds has the word "cancelled" stamped thereon, and each has a hole punched through the signature of the president of the company.

The argument on the part of Waring Brothers, to sustain the above provisions of the decree in regard to the 994 bonds, is, that the Illinois Midland bonds, amounting to $4,175,000, were intended to be largely used in retiring, by exchange, the bonds of the three sectional roads, amounting to $2,780,000; that, in the agreements made between Hervey and Grant Brothers & Co., and between Hervey and Waring Brothers, and between Waring Brothers and Grant Brothers & Co., in regard to the issuing of Illinois Midland bonds, and the exchange of the bonds of the sectional roads for them, the underlying contract was that the three sectional companies should be legally consolidated, so as to make the new Illinois Midland mortgage to be issued a first lien on the entire property; that the three parties above named owned, among them, all but a few of the Peoria, Atlanta and Decatur bonds, and all of the Paris and Terre Haute bonds, and a large portion of the Paris and Decatur bonds; that the agreement was, as understood by all parties, that the sectional bonds should be exchanged for the new Illinois Midland bonds, dollar for dollar, and that, as to such of the Paris and Decatur bonds as should not be retired by exchange, an equal amount of the new Illinois Midland bonds should be destroyed; that, under this arrangement, Grant Brothers & Co. and Waring Brothers would surrender their sectional bonds, secured by sectional first mortgages, and accept in lieu thereof Illinois Midland bonds, secured by what would be a first mortgage on the three roads, subject to the unexchanged Paris and Decatur bonds; that the written contracts on the subject stipulated that the three railroads should be "consolidated into one company under the name of the Illinois Midland Railroad Company;" that the purchases and fusion which took place were not a consolidation, within the meaning of the contracts; and that what was contracted for

was to be not merely a consolidation of the properties of the three companies, so that all those properties should pass to the ownership of one of the companies, but a consolidation of the companies themselves, they to be so united as to become one company and one artificial body.

We are unable to concur in this view, and are of opinion that what was done was a substantial compliance with the contracts. What Hervey did in procuring the sales of the roads, and the change of the name of the purchasing company, and in making the new mortgage and bonds, was done with the concurrence of Grant Brothers & Co. and Waring Brothers. The exchanges made of the Paris and Decatur bonds for the Midland bonds were not isolated transactions, but followed as parts of one transaction, by which the roads were united and the new bonds created and exchanged. The transaction contemplated by the contracts was fully performed, and the Paris and Decatur bonds, which Waring Brothers surrendered, were exchanged and surrendered specifically for cancellation. In the contract of July 4, 1874, between Waring Brothers and Grant Brothers & Co., it was provided that 907 Paris and Decatur bonds held by Waring Brothers should be exchanged for 907 of the new bonds of the Illinois Midland Company, and cancelled. The evidence and the written contracts show that it was contemplated by the parties, including Waring Brothers, that such of the Paris and Decatur bonds as should not be surrendered and exchanged should retain their precedence over the Illinois Midland bonds, and their priority of lien on the Paris and Decatur property. In the contract between Hervey and Grant Brothers & Co., of July 4, 1874, it was agreed that the latter should retain in their hands Illinois Midland bonds equal in amount to any Paris and Decatur bonds which should be outstanding, and should cancel and return to Hervey all Paris and Decatur bonds which should be exchanged by their holders for Illinois Midland bonds, and that if, after July 1, 1876, there should be any outstanding unexchanged Paris and Decatur bonds, Grant Brothers & Co., should cancel and return to Hervey an amount of Illinois Midland bonds equal to the amount of the then outstanding unex-

changed Paris and Decatur bonds. In the schedule to the agreement of July 4, 1874, between Grant Brothers & Co. and Waring Brothers, it was stated that the Illinois Midland bonds were to be issued "subject and in subordination only to such bonds already issued by the Paris and Decatur Railroad Company as for the time being shall be existing and be preferentially charged on the portion of the undertaking which shall have been constituted with or represent the undertaking of the said last mentioned railway company." The president of the Union Trust Company was advised of these agreements, in December, 1874. Waring Brothers surrendered to Grant Brothers & Co. 887 Paris and Decatur bonds and took from them this receipt:

"LONDON, *February* 17, 1875.

"Received from Messrs. Waring Brothers, 885 bonds of Paris and Decatur Railroad Co., as per attached list, in exchange for a like number of Illinois Midland bonds, in fulfilment of first clause of our agreement of July 4th, 1874, the difference between 885 bonds and 907 bonds mentioned in agreement having been drawn and cancelled between date of agreement and the present time, which 885 bonds of Paris and Decatur Railroad Co. are to be cancelled forthwith, in accordance with said agreement.

GRANT BROTHERS & Co."

In the agreement made as late as May 4, 1877, between Grant Brothers & Co. and Waring Brothers, it was agreed that the former should use their best exertions "to obtain the exchange of the outstanding Paris and Decatur bonds which have not yet been exchanged for Illinois Midland bonds, so as to complete the amalgamation."

The exchange and surrender of the 885 bonds was a completed transaction. No surrender of any of the Paris and Decatur bonds by any one was made dependent on the surrender of any others of them or of the whole. Each person who surrendered gave up his lien under the Paris and Decatur mortgage, and took one under the Illinois Midland mortgage, as it was; and took the risk of its value. He left those who did not surrender to hold under the Paris and Decatur mortgage.

There was no contingency and no reservation on the part of those surrendering. The surrender was for cancellation and was cancellation. The Illinois Midland mortgage and bonds were and are valid. All parties got what they contracted for.

In regard to the other 109 Paris and Decatur bonds (to make up the 994 exchanged bonds now presented by Waring Brothers, as holders), each of them is stamped with the word "cancelled," and each has a hole punched through the signature of the president of the company. In 1872, Waring Brothers purchased from Grant Brothers & Co. 928 Paris and Decatur bonds. July 4, 1874, they still held 907 of them. February 17, 1875, they had only 885. Afterwards Genis, acting for them and for Grant Brothers & Co., brought with him from London to the United States all the Paris and Decatur bonds which had been surrendered by any one and cancelled, receiving them from the custody of Grant Brothers & Co. These bonds included not only the 885, but undoubtedly the 22 others mentioned in the receipt, and 87 more necessary to make up the 994. All of the 109 bonds being marked cancelled, and the evidence as to the entire 994 being what it is, it must be held that the 109, as well as the 885, were exchanged, surrendered and cancelled, and that the decree is erroneous and must be reversed in regard to all of the 994.

The decree provides that the special commissioner, charged with its execution as to a sale, shall first offer the three railroad properties for sale each separately, and four locomotive engines (on which there is a specific lien) separately, and all other property acquired by the receivers otherwise than from said railroad companies separately, and, after having so offered said properties, shall then offer the whole of them for sale *en masse;* and, if the highest bid received by him for the entire properties shall exceed the aggregate amount of the several highest bids for them when offered separately, then the whole shall be struck off and sold as an entirety to the person making the bid, and the proceeds be divided into five parts, in proportion to the amounts bid separately, on the five constituent parts, and distributed to the lienholders and bondholders in the

same manner as if the five constituent parts had been sold separately.

Borg and others object to that provision, and claim that the holders of the unexchanged Paris and Decatur bonds are entitled to have a separate sale of the property covered by the Paris and Decatur mortgage. We have considered the views urged in opposition to the above clause, but are of opinion that under it, taken in connection with all the other provisions of the decree, the rights of the Paris and Decatur bondholders are sufficiently secured and that they have substantially the benefit of a separate sale. No one of all parties can get less by the sale in gross.

The appeal of the Union Trust Company does not cover any thing not embraced in the appeal of Borg and others.

The appeal of Waring Brothers is next to be considered. They object that certain claims of theirs under the head of "Miscellaneous" in schedule M to the commissioner's report, part of the receiver's indebtedness, are by the decree declared to be subordinate to the mortgages and bonds of the three sectional roads, namely:

$30,322.09. Claim assigned by Terre Haute and Indianapolis Railroad Company.

$14,140.67. Terminal facilities at west end; assigned by Toledo, Peoria and Warsaw Railroad Company.

$54,900. Loan account; allowed by order of court, June 11, 1884.

$32,000. Loan account; allowed by order of court, June 11, 1884.

$29,064.84. Rees' notes; allowed by order of court, June 11, 1884."

As to the $30,322.09, Waring Brothers bought the claim in August, 1877, from the Terre Haute and Indianapolis Company. The receivership owed that amount to that company for rent of track, materials supplied and traffic balances. The $14,140.67 was a claim bought by Waring Brothers, in September, 1877, from the receiver of the Toledo, Peoria and War-

saw Company. It was for rent of track, stores supplied and labor performed. As to both of these items, the debts were contracted by the receiver, and fall within the principle under which claims of like character are allowed priority.

As to the items of $54,900 and $32,000, "Loan Account," the commissioner, in his first report, made this statement: "The Loan Account. Receiver Genis borrowed of the First National Bank of Terre Haute the sum of $57,400 for the current expenses of the road, upon which he paid $2500, leaving a balance due the bank of $54,900. He had also a running loan account with McKeen & Co., another banking-house in Terre Haute, for moneys borrowed for the use of the road, upon which there is a balance due the bank of $32,000. These moneys were borrowed by the receiver as such, but the greater part thereof was further secured by the personal obligations of Mr. Genis or Waring Brothers. The transactions are, therefore, characterized by Mr. Freidenberg's counsel, as the personal accounts of those parties, and not the accounts of the receiver as such. But, even if it were true that these moneys were those of Mr. Genis individually, yet, if it were further true that Mr. Genis was authorized to make the expenditures for the protection, reparation or safety of the trust estate, and if he advanced his own moneys for that purpose, he could, I think, on principle, have a lien on the trust estate for moneys so advanced. *New* v. *Nicoll*, 73 N. Y., 131. But there appears to have been no express authority from the court to borrow these moneys. While a receiver entrusted with the operation of a railroad must necessarily be allowed a certain discretion as to outlays of money made in good faith in the ordinary course of business, and to a certain extent the details of the business must be left to his discretion, yet transactions of such magnitude as the loans in question are, I think, unwarrantable without the previous authority of the court; and the conduct of the receiver in this respect ought not to be sanctioned, and certainly cannot be permitted to become a precedent. At the same time, the evidence appears to show that the sums so borrowed were applied directly to pay the expenses of the receivership, repairs, supplies, pay-rolls, or to replace moneys which had been so applied.

Mr. Genis' testimony is very specific on these points. He says that, after applying the income of the road towards expenses, (repairs, supplies, pay-rolls,) and, when he could not longer postpone payment of balance, he had to borrow. While reprehending this unauthorized action, yet as the money was applied for repairs on the property and expenses of administering the trust, and as the transaction was thus beneficial to the parties in interest, and as no bad faith appears to be imputed to the lenders, it seems to me that the rejection of these claims, as against the lenders, would be harsh and inequitable. And, as Waring Brothers, upon whose credit, in part at least, these sums were advanced, have since paid the same to the original lenders, and taken an assignment of. the claims, I see no reason why they are not likewise entitled to payment." In the opinion on this report the Circuit Court said that it approved the conclusions of the commissioner as to "Loan Account." In the interlocutory decree of June 11, 1884, is this clause: "And the court approves the findings and conclusions of the said special commissioner under the head of 'The Loan Account,' in said report, and finds that the receiver borrowed of the First National Bank of Terre Haute, Ind., and of McKeen & Co., bankers, certain sums of money, which he applied directly to pay the necessary expenses of the execution of his trust herein, and that there are balances of $54,900 and $32,000, respectively, due on account of such loans; and the court orders, adjudges and decrees that the holders of said claims are entitled to priority of payment out of the trust estate, before payment of bonds." But, by the final decree, the items of $54,900 and $32,000 are declared to be subordinate to the mortgage bonds, while allowed as indebtedness contracted by the receivers. We are of opinion that these two claims ought not to be allowed priority. The debts were contracted without the previous authority of the court. The amounts were large; and we cannot sanction the action of the receiver in borrowing sums of money so large in amount, without the previous authority of the court, even though the purposes to which the moneys were applied were such as is shown.

As to the item of $29,064.84, it consists of eight notes given by receiver Rees, in May and December, 1878, as shown by

Exhibit X to the first report of the commissioner, in regard to which the commissioner said, in that report, under the head of " Accounts of Waring Brothers:" " The acceptances or notes of Dole and Rees, Exhibit X, aggregating $29,064.84, are contested upon the ground that those receivers had no power to contract the debts. Mr. Genis' explanation of the item appears on page 140 of the abstract. Seven of the eight notes appear to have been given for legitimate and necessary purposes, such as rent of railroad track, repairing of engine, purchase of stationary engine, money advanced for general expenses, etc., etc. The several amounts were small, and, I think, within the discretion of the receiver to contract. . It would be very trying on the court, as well as receiver, if the latter, in operating a railroad, were compelled to obtain the sanction of the court for all sums as small as these. The last item, of $7000, is more vigorously contested. An account of the transaction is given by Mr. Genis, (Abstract, 192). Waring Brothers were desirous that Rees should resign, and Genis, on their behalf, acceded to his demand for the payment of a forfeiture provided in Rees' private contract of employment with Waring Brothers, as a condition precedent to his resignation; and thus he ended his agency and his receivership at the same time. The payment of the forfeiture was made out of Waring Brothers' own funds, and there is no claim that it is a charge against the trust fund. On the day Rees resigned, he further insisted that Waring Brothers should advance moneys with which to pay a certain claim before he resigned. This was a debt of $7000 to a bank. It was a debt of the receivership, upon which he was also personally liable. On page 141, abstract, speaking of this item, Mr. Genis says: ' The last item, $7000, is cash given Mr. Rees, as receiver, and passed into the general funds, as the books will show.' It is broadly charged that this transaction was bribery, and that the bribe is now asked to be repaid out of the trust funds. Undoubtedly the debt paid was a debt of the receivership, the trust fund got the benefit of the payment, and the only benefit Rees received was his release as surety upon a debt of the receivership. Waring Brothers' money was loaned to the receiver, and was used by him to pay a debt for which the receivership was

primarily liable; and the fact that such payment was demanded by the retiring receiver, does not make it any the less a present debt against the receivership." In its opinion on that report the Circuit Court said that it approved the commissioner's conclusions as to "Accounts of Waring Brothers;" and, in the decree of June 11, 1884, it stated that "the court approves the findings and conclusions of said special commissioner under the head of 'Accounts of Waring Brothers,'" but the question of the priority of the item of $29,064.84, over the bonds appears to have been reserved by that decree. In the final report of the commissioner, under the head of "Relative equities of receiver's floating indebtedness and the mortgage bonds," after discussing the subject at length, he said: "I am, therefore, of opinion that all just indebtedness contracted by the receivers in the execution of their trust and in the operation of the road, including claims for labor and supplies, liabilities incurred in sustaining necessary business relations with other railroad companies, liabilities as a common carrier, damages to persons and property in operating the roads, obligations to shippers properly incurred in due course of business, and other claims, if any, of like character, and coming within the same principle, are entitled to priority in payment over bonds." But in the final decree, the item of $29,064.84 is not given such priority. We are of opinion that this item cannot be allowed priority, for the reason that the borrowing of the money for which the notes were given was not sanctioned in advance by the court. Though made up of amounts not, perhaps, large in themselves, the aggregate cannot be called small; and there never could be any difficulty in obtaining an order of the court, if one were proper, to borrow money to a specified total amount, for specific purposes. In any event, the item of $7000 could not be allowed priority, as the purposes for which that sum was used were not sufficiently shown.

Waring Brothers also object because the final decree orders that the "rents due Waring Brothers, for use of rolling-stock, as shown by Schedules U and W of" the final "report of the special commissioner," and "the sum of $21,099.43 due Waring Brothers for extraordinary depreciation of rolling-stock," be subordinated to the mortgage bonds of the three sectional

roads respectively. The net amount due for the above rents, as stated in those schedules, with interest to January 15, 1885, is $325,354.35, and that amount is allowed as a debt by the commissioner. The court did not allow it priority, and we see no sufficient ground for reversing the decision. The same conclusion is reached as to the item for $21,099.43.

Waring Brothers also object because the court did not, in the final decree, specifically allow ten claims of theirs, amounting to $67,488.81, set forth under the head of "Right of way claims and outstanding titles," in Schedule I to the second report of the commissioner, and give them priority to the mortgage bonds, and because that decree remitted the holders of those claims to such suits as they might "properly bring in any court of competent jurisdiction against the company alleged to be liable thereon, or against the purchaser or purchasers" at the sale to be made under the decree. We see no error in the decree in this respect; nor in its failure to allow interest on the items of $4500, $9100 and $17,001.47; nor in its failure to allow more to Waring Brothers for right of way, land, buildings and mechanics' liens, or to make any different provision from that made in regard to the use of any claims by them in payment of the railroad property, if they should purchase it; nor in its failure to give precedence over the mortgage bonds to the claims of Waring Brothers, called "six months' supply claims.

We come now to the appeal of S. A. Fletcher & Co. They are the holders of the three certificates of the 17th series, and the four certificates of the 18th series, before mentioned, and allowed with priority, and of seven other receiver's certificates named in Schedule N to the commissioner's second report, and allowed with priority, seven of the entire fourteen having been issued under one of the two orders before mentioned, each dated June 29, 1881, and the other seven under the other of those two orders. The Circuit Court, in its final decree, reserved for future determination all questions of the relative priorities and equities among those who were given liens prior to the mortgage bonds, in case the respective properties should not sell for amounts in excess respectively of the liens to which precedence was given over the mortgage

debts. S. A. Fletcher & Co. appeal from that part of the decree, and insist that the decree ought to have found that the receiver's certificates held by them were liens of the force, character and effect, and to the extent, provided by the two orders of June 29, 1881, according to the purport of the certificates, and entitled to priority of payment over all bonds and debts, and all receiver's debts and certificates, except the receiver's certificates specially excepted in those orders. By each of the orders of June 29, 1881, each certificate to be issued under it was declared to be a special charge and lien on the line and property in respect of which it should be issued, superior in lien to all mortgage bonds and debts of the company, and receiver's debts, except such receiver's debts as had theretofore been declared by order of court to be special charges and liens on such line and property. We are of opinion that (with the exception of debts for taxes and receiver's certificates issued to borrow money to pay taxes, or to discharge tax liens) there should be no priority or preference among the debts and claims, whether receiver's certificates or other debts, which are allowed precedence over the mortgage bonds of any road, but that all should stand alike, notwithstanding any orders heretofore made, and that the decree should so provide.

*It results that the decrees are reversed so far as they allow to Waring Brothers the benefit of the 994 Paris and Decatur bonds as unexchanged and uncancelled bonds, and so far as they deny priority over the Paris and Decatur bonds to the items of $30,322.09 and $14,140.67, and so far as they fail to provide that there shall be no priority or preference (with the exception above stated) among the debts and claims, whether receiver's certificates or other debts, which are allowed precedence over the mortgage bonds of any road; and the causes are remanded to the Circuit Court, with a direction to make those modifications in the decrees; and in all other respects the decrees are affirmed. No costs are allowed in this court for or against any party, and the expense of printing the record is to be borne equally by Borg and others and Waring Brothers.*