AMERICAN BRAKE SHOE & FOUNDRY CO. v. PERE MARQUETTE R. CO.

BLAIR et al. (BANKERS' TRUST CO. et al., Interveners) v. FARMERS' LOAN & TRUST CO.

(Circuit Court of Appeals,. Sixth Circuit.  April 18, 1913.)

No. 2,442.

1. CREDITORS' SUIT (§ 19*)—QUALIFICATION OF CREDITOR TO BRING—WAIVER OF OBJECTION.

The objection that a creditors' bill was filed by a single unsecured creditor without judgment or claim of lien is waived, and stands as though it never existed, when the defendant voluntarily appears, confesses the debt, admits its insolvency, and joins in the prayer for receivership; and such objection cannot be thereafter raised by other creditors, who were not parties to the suit as brought, but are subsequently brought in or are permitted to intervene; nor will the case be regarded as collusive merely because the parties acted in accord and arranged that the suit should be brought in a given court and that the averments of the bill should be admitted by the answer.

[Ed. Note.—For other cases, see Creditors' Suit, Cent. Dig. §§ 88, 89; Dec. Dig. § 19.*]

2. RECEIVERS (§ 117*)—RECEIVERS' CERTIFICATES—AUTHORITY TO ISSUE.

A court of equity has power, in either a foreclosure or creditors' suit against a railroad company, in a proper case and 'in the exercise of its duty to conserve and continue the operation of the property pending foreclosure, reorganization, or other appropriate disposition to borrow money through its receivers, and to make the receivers' certificates issued therefor a lien even upon the corpus of the property and superior to existing liens, although the authority to displace existing liens should be exercised with great caution, and should be carried no further than actually necessary to attain the desired result.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 204; Dec. Dig. § 117.*

Receivers' certificates, see notes to Postal Tel. Cable Co. v. Vane, 26 C. C. A. 350.; Nowell v. International Trust Co., 94 C. C. A. 601.]

3. RECEIVERS (§ 121*)—RECEIVERS' CERTIFICATES—PARTIES TO PROCEEDINGS.

It is not essential to the validity of an order authorizing the issuance of receivers' certificates in a creditors' suit against a railroad company that security holders whose liens are postponed should have been made parties by the bill, although no order finally affecting liens should be made without giving the holders opportunity to be heard.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 209; Dec. Dig. § 121.*]

4. RECEIVERS (§ 118*)—RECEIVERS' CERTIFICATES—PURPOSE OF ISSUE.

An order authorizing the issuance of receivers' certificates to pay for repairs and betterments and purchase new equipment, to conserve a railroad system and to enable it to render adequate service to the public pending a creditors' suit, as well as to meet maturing payments on equipment held under trusts and in large part paid for, and to pay interest on underlying divisional mortgages, the foreclosure of which would dismember the system and greatly depreciate its value, *held* within the discretion of the court and proper as against a junior mortgagee, whose lien covering the greater part of the system was thereby postponed, but too broad in authorizing payment from proceeds of the certificates of interest on mortgages covering portions of the system not directly in-

cluded in the lien of such mortgagee, and in provisions giving priority of lien on certain equipment.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 206; Dec. Dig. § 118.*]

Appeal from the District Court of the United States for the Eastern District of Michigan; Clarence W. Sessions, Judge.

Suit in equity by the American Brake Shoe & Foundry Company against the Pere Marquette Railroad Company, with the Bankers' Trust Company, the Central Trust Company of New York, W. W. Crapo, trustee, and the Farmers' Loan & Trust Company, trustee, as interveners. From an order obtained by Frank W. Blair, Dudley E. Waters, and Samuel M. Felton, receivers, authorizing the issuance of receivers' certificates, the Farmers' Loan & Trust Company appeals. Modified and affirmed.

The principal proceeding is a creditors' suit for a receivership over the property of the defendant railroad company, the administration of its railroad system, the marshaling of its assets, and the ascertainment and enforcement of the rights and equities of creditors in the railroad and other property of the defendant. The bill was filed April 3, 1912. This appeal is from an order authorizing the issue of receivers' certificates and from an order denying appellant's application to vacate the original order. In substance sufficient for present purposes the case is this:

The original Pere Marquette Railroad Company, which was a Michigan corporation, was organized in 1899 by the consolidation of three Michigan railroad companies—the Flint & Pere Marquette, the Detroit, Grand Rapids & Western, and the Chicago & West Michigan. The road was in the hands of a receiver from 1905 to 1907. In the latter year the present Pere Marquette Railroad Company (defendant herein) was organized under the laws of Michigan and Indiana, by the consolidation of the Pere Marquette Railroad Company (the Michigan corporation) and the Pere Marquette Railroad Company of Indiana. At the time this suit was begun the defendant was operating about 2,320 miles of railroad, of which about 1,840 miles were in Michigan, about 15 miles in Ohio (part of its Toledo line), about 60 miles in Indiana, about 70 miles in Illinois (both being parts of its line into Chicago), and about 355 miles in Ontario, Canada; the principal part of the Canadian mileage being the line from Detroit to Buffalo and Suspension Bridge. The Pere Marquette owned absolutely nearly all its Michigan mileage. Parts of its Ohio, Indiana, and Illinois mileage were owned in fee; other portions, as well as the Ontario mileage, were operated under leases and trackage agreements. Its entire mileage constitutes a single railroad system, controlled and managed by defendant. When the bill was filed there were outstanding so-called "divisional mortgages," executed by the respective companies forming the 1899 consolidation, amounting to nearly $26,000,000. These divisional mortgages affected only the Michigan property. There were also outstanding the following junior securities: (a) The "consolidated mortgage" given to appellant in 1901, under which bonds to the amount of $8,382,000 were outstanding, in the hands of the general public. It was the first mortgage covering the entire system in Michigan. (b) The mortgage given in 1903 by the Pere Marquette Railroad Company of Indiana, securing a bond issue of $675,000, and covering about 20 miles of railroad between the Michigan-Indiana line and Porter in the latter state. (c) Two mortgages, aggregating $5,870,000, issued in 1903, secured respectively by the stock and bonds of the Lake Erie & Detroit River Railway Company, which owned the 198 miles of railway in Ontario west of St. Thomas, and the entire of whose stock and bonds were owned by defendant. (d) The so-called refunding mortgage of 1905 and the "improvement and refunding mortgage" of 1911. The total unpaid principal of all these mortgages (including certain bonds pledged to se-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cure certain notes), plus certain unsecured debentures, amounted to about $72,000,000. There was due and unpaid more than $300,000 interest on certain of the divisional mortgages; and further large installments of interest on mortgages, both divisional and system, were soon to mature.

A substantial part of the motive power and equipment of the defendant railroad·was held under·equipment trusts, of which there were six, and on which there was unpaid more than $4,500,000, of which principal over $300,000 was already matured; other large amounts falling due in the near future. There was also over $70,000 semiannual interest due on the equipment obligations, and still further amounts soon to fall due. During the month of April defendant's March pay roll of about $650,000, and its Michigan taxes, amounting to over $600,000, were payable. There was a large floating indebtedness several times greater than the cash on hand, and several million dollars of debentures and notes were maturing on and before July 1st then next. No provision had been made for paying or extending such debentures and notes, nor for paying interest on underlying bonds, or the principal on equipment obligations so falling due; and the earnings and income up to July 1st following would be insufficient to cover any considerable part of the sums so payable. The defendant had been forced to postpone payment of audited vouchers for several large amounts of material and supplies. The road was being operated at a deficit. Less than two months before the bill was filed, the Board of Trade of one of the cities served by the railroad had represented to the Attorney General of the state that the railroad company was insolvent, charging serious inefficiency in the operating and maintenance departments, and requesting that the Attorney General "move for an adequate remedy and that without delay." The Michigan Railroad Commission had refused defendant's application for the issue of further securities with which to meet its pressing needs.

The bill set out in greater detail all or nearly all the facts we have in substance stated; also that defendant's officers estimated that to meet the payments due April 1, 1912, defendant would require at least $800,000 above cash on hand March 30, 1912, and above the estimated amount of earnings and income subsequent to that date; that defendant had no resources with which to meet such payments and no reasonable hope of final assistance to enable it to do so; that default in all or nearly all such payments was inevitable, and that there was danger of suits and levies on account of the indebtedness for material and supplies; that defendant was in danger, by reason of its financial condition, of forfeiting important trackage and leasehold rights and interchange of business with other roads; that there was also danger of irreparable loss to defendant and to its creditors and stockholders through default in payment of equipment obligations, which would authorize the seizure of equipment necessary to defendant's railroad operations, also from default in bond interest, and danger of mortgage foreclosure, as well as from default in payment of state taxes, involving large penalties; that the interests of not only defendant, but of the public as well, demanded the preservation of the railroad property and business; under the authority of a court of equity.

The defendant answered, admitting the general allegations of the bill; and joining in the prayer for receivership, the operation thereunder of the railroad's business, the marshaling of assets, and for ultimate sale of the entire property and assets of defendant. Upon the coming in of the answer, and on April 5th receivers were appointed with the broad powers of administration, management, and operation usual in railroad receiverships. Later an ex parte order was made authorizing the issue of receivers' certificates in the amount of $605,000, to pay taxes due the state of Michigan. The propriety of this order is not challenged.

The receivers filed their petition, asserting the necessity of expending "for the general betterment of the system" $775,000 in the purchase of new equipment, and $925,000 in acquiring new rails, engine houses, coal plants, yards, and depots; stating that during the 12 months ending April 30th then next there must be paid $1,800,000 principal on maturing equipment obligations secured by first liens on a large amount of equipment absolutely necessary to the continuance of the road's operations; that it would not be possible out of

the earnings of the system to make the proposed expenditures and to meet such payments on principal of equipment obligations, and yet meet the payments of interest on underlying bonds; that the several divisions on which the underlying bonds are liens had been operated as one system for over 10 years, and that a dismemberment thereof, such as might follow a default on any of the underlying bonds, would be against the best interests of the public, as well as disastrous to a large body of bona fide security holders. It was recommended that receivers' certificates be issued in the amount of $3,500,000, to meet the two classes of disbursements above stated, the certificates to be made a lien on all the property of the railroad company within the states of Michigan, Ohio, and Indiana, subordinate to the divisional securities and to the mortgages on the Indiana and Canadian properties, but paramount to all the other mortgages, including that of appellant; the certificates to be a first lien for $775.000 upon the new equipment to be bought, as well as a first lien for $650,000 on certain equipment, the final principal payment on which was included in the $1,800,000.

It was recommended that the interest on the underlying mortgages, including that of appellant (but excluding the mortgages junior thereto), as well as interest on equipment obligations (which for the year would amount to about $212,000) be paid out of earnings. It was stated that the earnings, as carefully estimated, would be ample to pay the interest on the underlying bonds, as well as taxes, rentals, and interest on equipment obligations and on receivers' certificates. It appears that at a hearing, evidently more or less informal, had a few days earlier, an estimate of the income for the coming year was presented, which, on the basis of adding 5 per cent. to the gross earnings for the preceding year, and fixing the operating expenses at 75 per cent. (which was a considerably smaller percentage than required for several previous years), would show a balance of a trifle over $2,600,000 available for payment of interest and principal of equipment obligations, after caring for deficits from outside operations, hire of equipment, taxes, rentals, and interest on receivers' certificates (presumably those then outstanding). The mortgage interest proposed to be paid out of earnings was $1,864,240. The interest on junior mortgages, for which no provision was made, was $1,287,579.

Notice of this petition was, under order of the court, given to appellant, as well as to the trustees under the mortgages of 1905 and 1911, respectively. The trustees under the two latter mortgages appeared specially, neither consenting to nor opposing the petition. The appellant also appeared specially, objecting that the notice given was insufficient to enable it to determine whether it should object to the granting of the application or to the form of the order. Judge Angell thereupon made an order authorizing the issue of certificates in the amount, for the purposes, and with the character of lien thereunder, recommended by the receivers (except in a minor respect later stated), and for the payment out of earnings of interest on mortgages and on principal of equipment obligations as so recommended. The order was made without prejudice to the receivers' right to apply thereafter for authority to pay interest on the 1905 and 1911 mortgages in case the earnings should so justify. Appellant was also permitted to file, by a designated date, his answer to the receivers' petition, and to object thereto in such form as it might be advised, and to move to set aside or modify the order with the same effect as if its objections had been presented before the order was made.

Appellant in due season filed its answer, assailing the order for receivers' certificates as made without jurisdiction, as unjustified by the circumstances, and as a wrongful impairment of the securities held by appellant's beneficiaries. The specific grounds of these objections will, so far as seems necessary, be stated in the progress of the opinion. The answer asked that the previous order be vacated. Upon further hearing, Judge Sessions denied appellant's application.

Meanwhile, the Attorney General of Michigan had asked leave to intervene, alleging that the railroad property had been "permitted to deteriorate and its equipment has been permitted to run down without proper repair or maintenance of its tracks and roadbed, without supplying new engines and cars

.and other equipment to replace worn-out and worthless equipment, and said railroad company has thereby incapacitated itself for the performance of its duties as a common carrier to the people of the state of Michigan." Intervention was denied, but order was made that the Attorney General be notified of all proceedings which under ordinary rules of procedure require notice, so as to permit the making of such application respecting such proceedings as the Attorney General might deem advisable, and as might be permitted by the court.

Geller, Rolston & Horan, of New York City, and H. E. Spalding, of Detroit, Mich. (H. E. Spalding, of Detroit, Mich., and Frederick Geller and Edward H. Blanc, both of New York City, of counsel), for appellant.

Miller, Smith, Paddock & Perry, of Detroit, Mich. (Sidney T. Miller, of Detroit, Mich., of counsel), for American Brake Shoe & Foundry Co.

White & Case, of New York City, Boynton, McMillan, Bodman, & Turner, of Detroit, Mich. (Roberts Walker, of New York City, and Henry E. Bodman, of Detroit, Mich., of counsel), for appellee Bankers' Trust Co.

Henry M. Campbell, of Detroit, Mich., for appellees receivers.

Beaumont, Smith & Harris, of Detroit, Mich. (Hal. H. Smith, of Detroit, Mich., of counsel), for appellee Crapo.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). [1] 1. The bill in the suit in which the receivers were appointed and the order in question made was filed by a single creditor, who had no judgment and claimed no lien, and who thus had no standing (except by consent of the defendant) to seize the latter's property and apply it to the satisfaction of complainant's claim. None of those representing the mortgage interests were made parties. The suit is criticised as in effect that of the railroad company and for the benefit of its stockholding interests. But the objection that the bill was filed by a single unsecured creditor, without judgment or claim of lien, is waived, and stands as though it had never existed, when the defendant voluntarily appears, confesses the debt, admits its insolvency, and joins in the prayer for receivership. Such objection cannot, therefore, be raised by other creditors, who were not parties to the suit as brought; and the case will not be regarded as collusive merely because the parties to the suit acted in accord and arranged together that the suit should be brought in a given court, and that the averments of the bill should be admitted by the answer. In re Metropolitan Railway Receivership, 208 U. S. 90, 110, 28 Sup. Ct. 219, 52 L. Ed. 403; Horn v. Pere Marquette R. R. Co. (C. C.) 151 Fed. 626, 633. We have no doubt of the court's jurisdiction to entertain the creditors' suit and to appoint receivers therein.

[2] Nor is there any doubt of the power of a court of equity, in a proper case, through its receivers (which constitute the hand of the court), to borrow money necessary for conserving the property and continuing its operation, pending foreclosure, reorganization, or other

appropriate disposition. A railroad company owes a duty, not only to its creditors and stockholders, but, by virtue of its franchise, to the public as well; and a court which has undertaken the administration of railroad affairs is charged with the duty of conserving and operating the property, so far as can practically be done, for the benefit of both public and private interests. In the exercise of this duty of conservation and operation, it may, in a proper case, make such repairs, replacements, and betterments as are purely essential to such results, and may, in a proper case. make the certificates for such loans a lien even upon the corpus of the property, and, so far as necessary, prior to existing liens. The authority, however, to disturb existing liens, should be exercised with great caution, and should be carried no further than actually necessary to attain the desired result. Wallace v. Loomis, 97 U. S. 146, 152, 162, 24 L. Ed. 895; Miltenberger v. Railroad Co., 106 U. S. 286, 309, 1 Sup. Ct. 140, 27 L. Ed. 117; Trust Co. v. Illinois Midland R. R. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Atlantic Trust Co. v. Chapman, 208 U. S. 360, 371, 28 Sup. Ct. 406, 52 L. Ed. 528, 13 Ann. Cas. 1155. While this power has been more often exercised in mortgage foreclosure cases, it is not limited thereto, but may be exercised in creditors' suits such as the one before us. Union Trust Co. v. Illinois Midland R. R. Co., supra, 117 U. S. 458, 6 Sup. Ct. 809, 29 L. Ed. 963. Disbursements of the nature of those here in question may, in a proper case, constitute expenses of conservation. Wallace v. Loomis, supra; Union Trust Co. v. Illinois Midland R. R. Co., supra.

[3] It is not necessary to the exercise of this power that the security holders whose liens are postponed be, by the bill. made defendants or otherwise brought in as parties to the creditors' suit. Of course, no order finally affecting liens should be made without giving to the holder of the affected lien adequate opportunity to be heard. But it is not fatal to the validity of the order before us that appellant was not heard before the order originally passed. It is sufficient that it was given opportunity to be heard before the order became practically effective. Union Trust Co. v. Illinois Midland R. R. Co., supra, 117 U. S. 459, 6 Sup. Ct. 809, 29 L. Ed. 963. The opportunity so given was full and adequate. The interests of no other lienholder are injuriously affected by the order made. There is thus no lack of proper parties. The crucial questions are those of fact: First, whether the circumstances necessitated (for the purpose of conserving and operating the railroad property) the borrowing of money for making the purchases and payments provided by the order; and, second, securing the money so borrowed in the way so provided.

[4] 2. We think the District Court did not exceed the limits of a proper discretion in authorizing the borrowing of $1.700,000, made up as follows: For new rail, $525.000; for new equipment, $775,000; three new engine houses, $150.000; three coaling plants, $100,000; two yards, $100,000; three new depots, $50,000. Judge Sessions well said:

"If it is necessary to the existence of this railroad that it have new equipment, and that betterments be added in order that it may serve the public,

and in order that it may be permitted to continue to exist as a railroad, and in order that it may preserve its integrity and its usefulness as a railroad, then the court has the power to provide. a way for the performance of that duty."

We construe Judge Sessions' opinion as holding that the equipment and betterments mentioned were necessary for the purposes just stated. While Judge Angell filed no opinion, we think we have the right to infer from the terms of his order that he held a like view. The concurring views of these two judges should not be lightly disturbed. We think the record sustains that view. The new rail was not to be used for extensions, but to replace lighter and worn-out rail in various parts of the system in Michigan (except some on the Indiana line), without reference to the existence of mortgage liens. Judge Sessions said (and we think rightly):

"The purchase of the new rails and the reconstructing of a portion of the line of the road is nothing more than the repairing of the road."

The new equipment was in large part to take the place of worn out and old equipment. There was shown to be crying need both of the new equipment, the engine houses, coaling plants, and additional yard room. Two of the engine houses were to supply the place of practically useless structures; the third to take the place of one occupied jointly with another road, with stalls too short and table too light for the modern engine, and so located that incoming and outgoing engines must cross the tracks of other companies, causing considerable delays. One of the coaling plants to be replaced was "about ready to fall on account of decay"; another was to take the place of a plant lately burned and where locomotives and trains are now coaled practically by hand— a witness stating that on one winter morning he counted 36 engines waiting for coal, and, according to his recollection, 20 of them frozen up. We understand that the two new yards are merely extensions of present yards, and that the extensions are needed to overcome serious congestion. While the need of new depots is perhaps not shown to be as urgent as in the case of the other proposed structures, they were apparently regarded by the court as immediately necessary and for the conservation and proper operation of the system. Judge Sessions well said, that:

"The depriving of a road of immediate and necessary improvements, such as station houses, such as roadbeds, is simply another way of dissipating and destroying the value of the road."

The amount of this item is but $50,000.

We are also satisfied that the District Court did not exceed its discretion in authorizing the borrowing of $1,800,000 for paying the principal of equipment obligations maturing during the year ending April 30, 1913. The equipment was held under six separate trusts. The aggregate purchase price of the equipment upon which the principal payments were proposed to be made exceeded $14,000,000, of which less than $5,000,000 remained unpaid. Nearly three-quarters of the latter amount was secured upon equipment purchased but little more than two years previously. That purchased in earlier years, and presumably more greatly depreciated in value, was in larger propor-

tion paid for. On the oldest equipment (which cost over $5,500,000) but $650,000 remained unpaid, and that amount was to be entirely paid under the order in question. The payment of the $1,800,000 would leave unpaid but little over $3,000,000 principal, as against over $14,000,000 purchase price. This equipment was essential to the operation of the road. Its loss, through default in payment therefor, would seriously hamper, if not cripple, the road's operation. Presumably its value was such as to justify complete payment.

It is true that the earnings were chargeable, in advance of interest on mortgages, with all the classes of items making up the $3,500,000 of certificates, and to the extent to which earnings were improperly diverted to interest payments borrowing would not be justified. If, however, it would have been proper to borrow money to pay the interest in question, no injustice has been done. Apart from the propriety of giving loans for interest payments priority over the lien of appellant's mortgage, it was clearly proper to borrow money to pay the interest on the "divisional mortgages," including the Indiana and Canadian lines; for default in such payment would naturally lead to foreclosure, with danger of dismemberment of the system, and the record is convincing that such dismemberment is against not only the public interests, but those of junior incumbrancers, including appellant.

3. The important question is whether conditions justified making the lien of the receivers' certificates prior to that of appellant's mortgage. The reason assigned for the priority given the lien of the certificates is that appellant's mortgage is the first of the "system" mortgages, and that, as the expenditures concerned are for conserving the system, the lien thereunder should antedate appellant's lien, and that if subordinate to the latter lien the certificates would not be salable. Broadly speaking, this plan of priorities seems justified. The expenditures for rail, new equipment, engine houses, coaling plants, yards, and depots increased the value of the system, and thus to an extent (although not to the full extent of the disbursements) increased the value of appellant's lien. Moreover, the discharge of obligations for equipment on which appellant has a lien would normally increase its security. Again, it cannot well be complained that interest on the mortgages of the "constituent" companies (the three original divisions) is in fact borrowed, and so given a standing prior to appellant's lien; for those mortgages being ahead of appellant's, and their properties covered by the latter's lien, it cannot sensibly prejudice appellant's rights that the interest is paid and made a separate lien, rather than left in arrears and added to the principal lien.

The interest on the Indiana securities stands on a somewhat different basis, for appellant's mortgage is not directly a lien upon the Indiana line. But, apart from the consideration of preventing dismemberment through default in Indiana interest, we think its payment works no injustice to appellant; for while the earnings of the Indiana mileage do not appear, and it is thus not affirmatively shown that its net earnings are such as to provide for interest charges, yet the court may judicially notice that the Indiana mileage is part of the important line between Grand Rapids and Chicago, necessary to the Chicago con-

nection, and presumably its value to the system is such as to warrant its retention to the extent of paying the small annual interest ($27,-000) upon its mortgage indebtedness.

In the nature of things, appellant is, at the best, bound under the general plan of the order to suffer some impairment of its lien. So far as such impairment is necessary to the conservation of the road, and the performance of its public and private duties, appellant must submit to the impairment. And such seems to be the situation with reference to the purchase of new equipment, rail, engine houses, coaling plants, yards, depots, interest on mortgages of constituent companies and on the Indiana mortgage, and the payment of principal and interest on existing equipment obligations. But appellant should not be called upon to suffer impairment of security further than actually necessary for conservation and due operation of the system. We are disposed to think that in two respects the order unduly adds to appellant's burden:

(a) It has no direct lien upon the Canadian lines. Interest upon the indebtedness charged on those lines is in practical effect to be borrowed, and the indebtedness, therefore, given priority over appellant's security. Such interest is, therefore, to be paid to the ultimate prejudice of appellant, unless the net earnings of the Canadian lines available to the receivership provide therefor, and except to the extent that appellant is benefited by avoiding foreclosure on the Canadian lines. Appellees insist that these lines have net earnings available to fully meet interest charges, and that thus appellant is not injured. The margin of net profit from recent operations appears small, and the Canadian lines are being operated under a Canadian receivership; the money being disbursed only by order of the Canadian courts. Appellees say that "the order appealed from does not direct the Michigan receivers to pay the Canadian interest out of Michigan earnings," and that "it cannot be assumed that these receivers will use this discretion by applying Michigan earnings to pay Canadian interest." We are disposed to think that appellees should be taken at their word, and that the order should be so modified as to permit the payment of Canadian interest only out of net Canadian earnings.

(b) With respect to appellant's lien on equipment: As to that already bought since the organization of the present company in 1907, and that to be bought through the medium of the receivers' certificates, appellant is confronted with the legal question (upon which we express no opinion) whether the lien of its mortgage, under the after-acquired property clause, is prior to the lien of the securities given by the present company. The order makes the certificates a first lien upon all the new equipment purchased, as well as on the $650,000 of equipment obligations entirely discharged (in case the same shall be acquired by or for the receivers), and "through such obligations an ultimate first lien on all the equipment which now directly or indirectly secures such obligations," as well as on any other equipment obligations acquired by the receivers representing principal equipment payments authorized to be met. Moreover, as to the equipment released by the payment of existing equipment obligations, the order not only provides for making the certificates an ultimate first lien thereon

but authorizes a trust agreement under which the title to and ownership of all such new equipment, and the ownership of all said equipment obligations, shall rest in such trustee, for the benefit, not only of certificate holders, but "of any future securities, issued in pursuance of any plan of reorganization, for the refunding of such certificates in whole or in part." The complaint that certificates are to be issued in part for purchase of equipment (or the payment of obligations therefor) on which appellant's mortgage *may* not become an effective lien, is not, we think, fatal to the order. Appellant asserts the priority of its lien over that of subsequent mortgages, and the necessity of the equipment for preserving the integrity of the railroad property is apparent. But we see no reason to provide now for reorganization possibilities; and, in order to avoid, so far as possible, any foreclosing of or prejudice to appellant's rights, we think the order should contain an express provision that nothing contained in it shall impair any otherwise existing right in appellant to be subrogated to the lien of the certificates upon both classes of equipment, old and new, to the extent that such equipment may not be subjected to or be sufficient for the payment of the certificates, nor shall it create any new priority, save the lien of the certificates themselves, as against the lien of appellant's mortgage, in so far as it may by law attach to the equipment.

4. Appellant complains of the direction to the receivers to pay the interest on appellant's mortgage, as tying its hands by preventing foreclosure, thus precluding relief from a burdensome situation. Under ordinary conditions, appellant could not be heard to complain of the payment of interest to itself, and thus of a prevention of a default which would give right of foreclosure. Lloyd v. C. & O. S. W. Ry. Co. (C. C.) 65 Fed. 351, 356. But the situation here is a peculiar one. The order in question was made nearly a year ago. The estimated net income from operation for the then ensuing year, in view of which the order in question was made, added to the amount expected to be realized from the certificates, bid fair to lack several hundred thousand dollars of meeting the payments contemplated during the ensuing year, including interest on underlying mortgages, principal and interest on equipment obligations, new equipment purchases, the making of betterments and the meeting of current, matured obligations; and this without providing for the payment of the principal of more than $4,-000,000 of receiver's certificates, unmatured equipment obligations (maturing, in part, from year to year thereafter) of more than $3,000,-000, besides at least $5,000,000 of debentures maturing July 1, 1912, to say nothing of more than $1,200,000 of interest on junior incumbrances.

If, as seemed not unlikely when the order was made, an indefinite continuance of the receivership is to result in a constantly increasing indebtedness prior to appellant's mortgage, appellant can, we think equitably complain of the denial of opportunity to foreclose. The record does not advise us of the salable value of the railroad property. But, to say the least, it may well be that further considerable increase of indebtedness prior to appellant's mortgage will seriously impair, if not destroy, its value. The object of a creditors' suit is not

to permanently or indefinitely tie up the property, but merely to conserve and operate it pending ultimate disposition, to marshal its assets, and in some suitable manner to devote them to the payment or security. of its indebtedness. We are not advised of the receiver's plans for the coming year, nor should we attempt to forestall the exercise of discretion by the District Court. Under the circumstances, we content ourselves with suggesting that our action upon the present order must not be taken as indorsing the propriety of further increasing the indebtedness prior to appellant's mortgage in injury to that security, without leaving appellant free to protect itself by foreclosure. Should that question later arise, it can then be determined.

The order appealed from should be modified as suggested in subdivisions (a) and (b) of paragraph 3 of this opinion. In other respects, it is affirmed. The costs of the appeal will be divided.