**JAMES SUPPLY & HARDWARE CO. et al. v. DAYTON COAL & IRON CO., Limited.**

(Circuit Court of Appeals, Sixth Circuit. June 8, 1915.)

No. 2623.

1. BANKRUPTCY ⬤60—"ACTS OF BANKRUPTCY"—RECEIVERSHIP FOR CORPORATION.

If the appointment of a receiver for an insolvent corporation, although made in a suit to which it was defendant, was in fact procured by the corporation and in its behalf, it is as effectively an "act of bankruptcy" under Bankr. Act July 1, 1898, c. 541, § 3a(4), 30 Stat. 546 (Comp. St. 1913, § 9587), as though the suit had been in its own name as complainant.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 80; Dec. Dig. ⬤60.

For other definitions, see Words and Phrases, First and Second Series, Act of Bankruptcy.]

2. BANKRUPTCY ⬤60—ACTS OF BANKRUPTCY—RECEIVERSHIP FOR CORPORATION.

In such case it is immaterial that the receivership was not ordered because of insolvency, but it is sufficient if the corporation was actually insolvent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 80; Dec. Dig. ⬤60.]

3. BANKRUPTCY ⬤95—ACTS OF BANKRUPTCY—QUESTIONS FOR JURY.

That the procurement of the receivership was not formally authorized by a vote of the directors or stockholders will not necessarily prevent it from constituting an act of bankruptcy; and, where there was evidence that it was authorized by the managing director, whose firm also owned the majority of the stock, and who, with those acting with him in such procurement had full control of the company's affairs, the question whether it was the act of the corporation was one for the jury.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 132, 140, 145; Dec. Dig. ⬤95.]

In Error to the District Court of the United States for the Eastern District of Tennessee; Edward T. Sanford, Judge.

In the matter of the Dayton Coal & Iron Company, Limited, alleged bankrupt. From a judgment entered on a directed verdict, dismissing the petition, the James Supply & Hardware Company and others, petitioning creditors, bring error. Reversed.

Frank Spurlock and C. C. Moore, both of Chattanooga, Tenn., for plaintiffs in error.

George H. West and D. L. Grayson, both of Chattanooga, Tenn., for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

KNAPPEN, Circuit Judge. On a trial to a jury of the issues joined upon a creditors' petition for adjudication in bankruptcy verdict was rendered by direction of the court, and judgment of dismissal entered accordingly. The case is here on writ of error. Elliott v. Toeppner, 187 U. S. 327, 23 Sup. Ct. 133, 47 L. Ed. 200.

There was substantial evidence tending to show insolvency. The act of bankruptcy finally relied upon is that respondent, as alleged, being insolvent applied for a receiver of its property. B. A. § 3a(4). The receivership in question was applied for and obtained in a suit brought in a state court of Tennessee in the names of three creditors of the Dayton Company, claiming priority in favor of Tennessee creditors, under sections 2551, 2552, of Shannon's Tennessee Code, and asking a winding up of the corporation. There was testimony tending to show that this proceeding was instituted at the instance and for the benefit of the Dayton Company, and through its representatives. The district court held that, as matter of law, on the record made the institution of this proceeding and the obtaining of the receivership was not the act of the Dayton Company. Whether this conclusion is correct is the pivotal question. We of course state the testimony, so far as given, in the aspect most favorable to the petitioning creditors against whom verdict was directed.

The Dayton Coal & Iron Company was a British corporation, having its home office in Glasgow, Scotland. It was engaged at Dayton, Tenn., in mining coal and making pig iron. Sir Peter Donaldson, who resided at Glasgow, was the managing director of the company, and there was testimony that he "had control of all the company's affairs." He was a member of the Glasgow firm of James Watson & Co., which owned a majority of the stock of the Dayton Company, controlled it and financed its affairs. The Dayton Company maintained an office at Cincinnati, from which the sales and commercial transactions were handled. Mr. Whitaker was assistant to the managing director and the highest representative in the United States of the Dayton Company. He had charge of the Cincinnati office and general supervision of commercial affairs at Dayton. Mr. Miller, of Chattanooga, was the general counsel in the United States of the Dayton Company and "represented the company in its legal affairs." Watson & Co. bought pig iron in the United States, and in that relation dealt directly with the Dayton Company. Shortly before June 9, 1913, Watson & Co. failed, and so defaulted on a draft for £4,000 drawn by the Dayton Company upon Watson & Co., and held by the Equitable Trust Company of New York. This failure immediately embarrassed the Dayton Company, which was unable to protect the draft, and the Dayton Company's bank creditors became insistent. Whitaker cabled the situation to the Dayton Company at Glasgow, asking what advice should be given, and stating that "director must come with full power to act." Sir W. B. Peat, a member of an accounting firm doing business both in Great Britain and in the United States, was in New York as "the representative of Watson & Co.," and was slated as liquidator of the affairs of that firm. The Dayton Company cabled Whitaker from Glasgow to go to New York and consult with Peat respecting the failure of the Dayton Company, and, if possible, to take Miller with him. Whitaker was also advised that liquidation could not be avoided, and to pay nothing more without consulting Miller. The latter was unable to go to New York at the time, but had a conference with Whitaker, and gave his opinion, from what Whitaker told him,

that a receiver should be appointed. Whitaker met Peat in New York on June 14th, and communicated to him Miller's views as to the necessity of the appointment of a receiver. Peat concurred in these views. On the evening before the interview with Peat, Miller wired Whitaker at New York:

"Am impressed immediate receivership suit here is best. Wire me your views quickly on arrival and also later after consulting with parties there."

[1] The subject seems to have been further discussed between Miller and Whitaker over the telephone, and Whitaker wired that he thought Miller's method so communicated correct, and that he would "wire just as soon as can see Peat." During the 13th and 14th Miller and Whitaker exchanged telegrams, Miller stating that he would not "precipitate action unless forced," and expressing himself as "anxiously awaiting your advice as to whether bankruptcy inevitable," Whitaker wiring Miller on the 13th that he had seen Peat, "who states to adopt plan outlined by you over telephone at once," and on the 14th, "to proceed at once." On the morning of June 14th the insolvency proceeding was instituted, the bill therefor being drafted under Miller's direction and largely by his dictation, and without definite arrangement (previous to its drafting) with the creditors in whose names it was to be filed. The bill was filed by another solicitor, who spent part of his time working in Miller's office on a salary. On the same day Whitaker wired Miller that he had "consulted with Peat who is instructed by Watson," and that Peat "advises receivership and desires his partner here Archibald Bowman appointed a receiver." An injunction was issued in the proceeding under the creditors' bill on June 14th, but no receivership was then ordered. The original bill alleged the Dayton Company's insolvency. An amended bill, decided upon by Miller, and filed on the 16th, withdrew that charge; the Dayton Company formally appeared and waived service of process and notice, "for the purpose of enabling the chancellor, without further notice [to] pronounce such decree and make such order herein as to him seems proper." Mr. Noyes, the Dayton Company's superintendent, was at once appointed temporary receiver in Tennessee. On the next day Whitaker wired the Dayton Company at Glasgow the fact of the appointment, and that attempt would be made to appoint Noyes temporary receiver in Ohio, which was done, and cable notice given by Whitaker on the next day. A few days later Bowman was appointed co-receiver with Noyes. There was thus substantial testimony tending to show that the receivership was procured at the instance of and by concert between Peat, Whitaker, and Miller. If the receivership was so procured by actual authority of the Dayton Company, and on its behalf, it was as effectively an act of bankruptcy as if the suit had been directly in the name of that company as complainant (Exploration Co. v. Pacific Co. [C. C. A. 9] 177 Fed. 825, 839, 101 C. C. A. 39), and the district court so held. Wheeler v. Denver, 229 U. S. 342, 33 Sup. Ct. 842, 57 L. Ed. 1219, contains nothing to the contrary. What is there said respecting collusion relates merely to jurisdiction. Similar holdings are found in Re Metropolitan Ry. Receivership, 208 U. S. 90, 110, 28 Sup.

Ct. 219, 52 L. Ed. 403, and American Brake, etc., Co. v. Pere Marquette R. R. Co. (C. C. A. 6) 205 Fed. 14, 18, 123 C. C. A. 322. Here the question of intent to evade the provisions of the Bankruptcy Act is involved.

[2] It is immaterial that the receivership was not ordered because of insolvency. If the corporation was actually insolvent at the time receivership was applied for, it is enough. Hill v. Electric Co. (C. C. A. 6) 214 Fed. 243, 130 C. C. A. 613.

[3] We are not impressed by the proposition that the application for a receiver by this corporation would not be an act of bankruptcy unless shown to have been expressly authorized by formal action of its board of directors or stockholders; and the district judge did not so decide. Not only is there nothing in the record to indicate that the managing director of this British corporation lacked authority to direct such action, but the testimony is inferentially to the contrary, and is specifically that he had complete control of the company's affairs. If Donaldson individually lacked full control, there was testimony that Watson & Co. represented the stock control and, inferentially at least, had whatever control Donaldson lacked; and it is perhaps of some interest in this connection that the amended bill in the insolvency proceeding by implication treats the members of Watson & Co. as Whitaker's principals. We think the record did not impugn the existence of full authority on the part of Donaldson and Watson & Co. to direct the receivership, and thus the commission of an act of bankruptcy. Exploration Co. v. Pacific Co. (C. C. A. 9) 177 Fed. 825, 839, 101 C. C. A. 39; In re Maplecroft Mills (D. C.) 218 Fed. 659, 673; 1 Remington on Bankruptcy (2d Ed.) § 152. Moreover, if those placed in full charge of the company's affairs were thus clothed in fact with sufficient power to actually accomplish a legally effective receivership, we cannot think the application therefor was any the less an act of bankruptcy because those responsible therefor had no right, as against the stockholders, to so act. A somewhat contrary holding was had in Re Wm. S. Butler Co. (C. C. A. 1) 207 Fed. 705, 713. How far that decision may have been affected by the law under which the corporation was organized does not appear.

As to the authority of Whitaker and Miller: It is unnecessary to decide whether either or both had, by virtue alone of their official positions, general authority to act for the corporation in instituting the receivership. Had the general counsel filed such bill in the name of the corporation, his authority to do so would be presumed. Pacific R. R. Co. v. Ketcham, 101 U. S. 289, 296, 25 L. Ed. 932, and we should hesitate to declare, as matter of law, in view of his general relation to the corporation, that he would not have authority to take such action through another medium when acting in the good-faith representation of the corporation's interests. We think, however, there was testimony tending to show special authority from the Glasgow management for the procuring of receivership. Miller, Whitaker, and Peat were instructed to confer together regarding the course to be taken. They did so, and acted according to their judgment. True, there is no evidence of an express direction by the Glasgow office of the Dayton

Company that action should be taken under Peat's sole advice or under that of Miller, or specifically that receivership should be applied for; but we think that under the circumstances, including the fact that Whitaker had asked the Glasgow office to send a director with power to act, and taking into account the other telegrams referred to, a direction that action should be taken according to the course which should be adopted after conference between these three persons is naturally implied, especially in view of what later passed between the Glasgow office and its representatives in the United States respecting the appointment of receiver already had and the proposal for further and ancillary appointments. Apart from such effect as they may have by way of ratification, we think these later communications, in the absence of reply thereto, directly tended to show that the company's representatives in the United States had correctly construed the authority given them from Glasgow. While, as suggested, Peat was spoken of as Watson & Co.'s representative, the later express reference of Whitaker to Peat, made by the Glasgow office of the Dayton Company, made him the company's representative for the purpose, even though originally he represented only Watson & Co., and regardless of the effect of such representation in view of the relations between that firm and the Dayton Company. And while Whitaker's telegram of the 14th was probably received by Miller after the creditors' bill was filed, and the second telegram of the 13th probably after the creditors' bill was drafted, the telegram last referred to seems to have been in accord with previous expectation, and both arrived before the amended bill was filed and the receivership application heard. It need scarcely be said that Miller's relation as creditor of the Dayton Company is important only as it affects the ultimate question whether the application for the receivership was the act of that company.

It results from these views that the issue should have been submitted to the jury. The judgment of the district court is accordingly reversed, with costs, and the record remanded to that court, with directions to award a new trial.