**CENTRAL TRUST CO. OF NEW YORK v. PITTSBURG, SHAWMUT & N. R. CO. et al.**

No. 9861.

United States Court of Appeals
Third Circuit.

Argued June 9, 1949.

Decided Sept. 29, 1949.

Rehearing Denied Oct. 26, 1949.

Lee W. Eckels, Pittsburgh, Pa. (Thorp, Bostwick, Reed & Armstrong, Pittsburgh, Pa., on the brief), for appellants.

Bruce R. Martin, Pittsburgh, Pa. (Dalzell, McFall, Pringle & Bredin, Pittsburgh, Pa., Vincent M. Casey, Margiotti & Casey, Pittsburgh, Pa., Richard B. Tucker, Jr., Patterson, Crawford, Arensberg & Dunn, Pittsburgh, Pa., on the brief), for P. R. R. and other appellees.

John G. Buchanan, Pittsburgh, Pa. (Milton W. Lamproplos, Smith, Buchanan & Ingersoll, Pittsburgh, Pa., on the brief), for American National Red Cross and other appellees.

Before MARIS, GOODRICH and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

The question presented on this appeal is whether the expenses incurred by a receiver in operating a railroad should be paid out of a fund derived from the liquidation of the estate prior to any distribution to the holders of certificates of indebtedness issued by a receiver for capital expenditures.

The Pittsburg, Shawmut and Northern Railroad Company, and its affiliates, the Shawmut Mining Company and the Kersey Mining Company, have been in the hands of equity receivers since 1905. In the early years of the receivership, certificates of indebtedness were issued by the receiver for capital improvements, betterments and additions to the railroad and the mining properties of its affiliates. As of June 16, 1927, there were outstanding such certificates in the amount of $2,044,350; of these, $1,932,060 in principal amount are publicly held, and $112,290 in principal amount are held as part of the receivership estate of Shawmut Mining Company. Interest, from December 1, 1932, to April 1, 1947, has accrued in the amount of $1,661,571.60.

On November 29, 1945, the then receiver, having outstanding various debts for current operating expenses, was discharged. The new receivers operated the estate for a relatively short time, sold the assets, and now have available for distribution the sum of $1,179,327.21. A schedule of distribution was prepared. "Schedule A", thereof, listed allowed unpaid expenses totaling $259,477.24, of the discharged receiver for his operation of the Railroad Company. On November 9, 1948, the District Court overruled exceptions to "Schedule A" and ordered payment forthwith, thus preferring the operating expense creditors of the discharged receiver over the certificate holders. Accordingly, the latter have appealed, contending that the certificates and the interest thereon, or

either, should share the amount available for distribution pro rata with the current operating expenses of the discharged receiver.

The orders of court authorizing the issuance of certificates of indebtedness provided that the certificates should be a lien upon the mortgaged premises and the net income prior to the liens of the then existing mortgages, and in the event of any sale of the mortgaged premises, the certificates should be paid out of the proceeds prior to any payment on account of such mortgages. The discharged receiver had been authorized to operate the railroad and to pay, "out of the funds from time to time coming into his hands from the operation of said railroad * * * the necessary current expenses of operating the mortgaged property and premises and executing the trust hereby vested in him, including all taxes and assessments upon the said property."[1] Historically, the receivers have always paid, without objection, current operating expenses. No objection, on the ground of preference, has been registered to the disbursements for operating expenses made by the discharged receiver during the same period in which he incurred the expenses here in controversy, nor did the certificate holders object to the payment by the present receivers of their operating expenses. Indeed, it was conceded to the learned District Judge that there is no substantial difference between the operating expenses of the discharged receiver and those of his successors, other than the fact that the certificate holders elected to insist upon sharing the res with the former.[2]

The obvious advantages to the certificate holders and to the public in preserving the railroad as a going concern warrant our agreement with the statement that

"* * * the conclusion ought not to be indulged, unless inexorably compelled by the language of the order and the conditions under which it was made, that the court was intending to fetter and perhaps render wholly impossible the continued operation of the railroad, by an impotence to make acceptable provision for necessary future expenses." Reconstruction Finance Corp. v. Missouri-Kansas-Texas R. Co., 8 Cir., 1941, 122 F.2d 326, 331; see Anderson v. Condict, 7 Cir., 1899, 93 F. 349, 353.

Here, in subjecting the proceeds of the sale of the railroad to the certificates, the orders of authorization do not purport to do more than fix the priority between the certificates, the mortgages, and the existing liens. They cannot be said to have accorded the certificates a priority over any other indebtedness properly incurred by the receivers, nor can they be said to have foreclosed the matter of future operating expenses.

In this situation, the court below, as a court of equity, undoubtedly had the power, exercisable within the bounds of proper discretion, to examine afresh the priority issue as among the creditors of the receivers.[3] Reconstruction Finance Corp. v. Missouri-Kansas-Texas R. Co., supra. And, of course, the encumbered property of the debtor is not beyond its reach for this purpose. Thus, in Union Trust Co. of New York v. Illinois Midland R. Co., 1886, 117 U.S. 434, 464-465, 6 S.Ct. 809, 826, 29 L.Ed. 963, it was said with respect to unsecured operating expenses, "Of course, such items are payable out of income, if any, before the corpus is resorted to; but that may be resorted to when the items are proper ones to be allowed for operating expenses, after scrutiny and opportunity for those opposing to be heard. * * * The terms of these orders do not

---

1. Order of December 27, 1923, appointing John D. Dickson as successor receiver. The order of November 29, 1945, discharging Mr. Dickson and appointing the present receivers gave to them the same authority vested in their predecessors.
2. Transcript of Hearing of August 28, 1947, pp. 48-49.
3. Even where the orders would seem to attempt to create an absolute priority,

there is indication that the equity powers of the court may not be so dispossessed: see Louisville, Evansville & St. Louis R. Co. v. Wilson, 1891, 138 U.S. 501, 506, 11 S.Ct. 405, 34 L.Ed. 1023; Reconstruction Finance Corp. v. Missouri-Kansas-Texas R. Co., 8 Cir., 1941, 122 F. 2d 326, 331; Ball v. Improved Property Holding Co., 2 Cir., 1917, 247 F. 645, 650.

impair or exclude the ample authority which the court would otherwise have, and otherwise has, to order the claims in question to be paid out of the property itself, with priority."

It should be observed that the orders appointing the various receivers secured to them the authority to discharge current obligations out of operations, and that the orders authorizing the certificates subjected them, insofar as income was concerned, to the priority of the operating expenses, for their lien extended only to the "net income". We recognize, as apparently did the District Court, the mortgagees and the certificate holders, that continued operation of the road depended upon the freedom of the receivers to incur and provide for their expenses of operation. Not merely, then, for the public interest in prolonging the road's service, but as well for the protection and productivity of the capital investment, were the certificates made subservient to current expenses in their claim upon earnings, and the latter assured of priority. Had not such consideration been accorded to those whose services and supplies do not, in equity, come within the category of investment, the receivership might well have foundered and long since resulted in a distribution where, as here, the properties were already heavily surcharged. As it turned out, the receivers, in the past, paid off approximately thirty-five percent of the original obligation on the certificates, and maintained interest payments until 1932.[4] And it appears that along with the advances on the certificates, approximately $1,000,000 of net income was utilized to increase the capital investment, of which the certificate holders obtain the primary benefit.

The issue of priority having been left to the discretion of the court below and its authority being clear, we cannot say, under the circumstances related above, including the evident intention of the appointments and certificates to prefer operating expenses, that the learned District Judge abused the discretion confided to him. The order of distribution recognizes the first lien of the certificates, but not to the prejudice of what was necessary to be done in their own interest.

For the reasons stated the order of the court below will be affirmed.

4. Between August 25, 1905, and July 3, 1917, certificates were issued in aggregate face value of $3,100,000, for which approximately $3,000,000 was received and devoted to the capital investment. Pursuant to the order of court dated February 29, 1924, thirty per cent of the outstanding certificates were retired, and new certificates issued for the balance. Pursuant to the order of court dated June 16, 1927, five per cent of the outstanding certificates were paid, and new certificates issued for the balance.